## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of
New Mexico,

                Defendant.

No. 1:25-cv-01193-LF-JFR

## MOTION TO DISMISS OF
## INTERVENOR-DEFENDANTS COMMON CAUSE,
## CLAUDIA MEDINA, AND JUSTIN ALLEN

Common Cause, Claudia Medina, and Justin Allen (collectively, "Common Cause Intervenors") respectfully move to dismiss the United States' Complaint and oppose the United States' request for New Mexico's full and unredacted electronic voter file, and set forth the legal argument necessary to support their motion below. *See* L.R. Civ. P. 7.1(a).[1]

## INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Because the United States failed to disclose the basis and purpose of its request for the data, dismissal should be granted, and its attempt to summarily dispose of this case via an improper motion to compel should be rejected.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir.

---

[1] This motion is nearly identical to the proposed motion attached to Common Cause Intervenors' motion to intervene (at ECF No. 21-1). Common Cause Intervenors have updated: (A) the title and first paragraph of the motion to reflect that intervention has been granted; (B) the filing date and certificates; and (C) one factual representation about how many similar lawsuits the United States has filed against elections officials elsewhere, as the number has increased since December 19, 2025.

1994) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). It is "preservative of all rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas amongst our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.*, as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.* These statutes were enacted for the purpose of ensuring that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As the U.S. Department of Justice has itself explained, Title III of the CRA, the election-records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956, at 7 (1959)).

The federal government's demand for New Mexico's unredacted voter file—which contains sensitive personal information such as full birth dates, driver's license numbers, and Social Security numbers from every voter in the state—undermines these statutes' core purposes and is contrary to law. The public disclosure of state voting records is important to ensure transparency and the accuracy of the voter rolls, especially by ensuring that citizens are not erroneously removed from the voter records. But releasing the State's voting records *without redaction* and for purposes far afield from protecting voter access would only deter voter participation and undermine the right to vote. That is especially so here where the United States has failed to fully and accurately set forth "the basis and the purpose" for their request for this data, as required by the very statute that it purports to invoke. 52 U.S.C.

§ 20703. Because the United States has failed to establish its entitlement to a complete, unredacted New Mexico voter file, the Court should dismiss this action.

## BACKGROUND

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Ctr. for Just., *Tracker of Justice Department Requests for Voter Information* (updated Dec. 12, 2025), https://perma.cc/MC3M-VS33.

On September 8, 2025, DOJ sent a letter to the New Mexico Secretary of State ("the Secretary") demanding an electronic copy of New Mexico's entire statewide voter registration database. Compl. ¶¶ 18–20; Letter of Harmeet K. Dhillon to Maggie Toulouse Oliver (Sept. 8, 2025), ECF No. 2-3 ("DOJ Ltr.").[2] DOJ specifically requested an unredacted copy of the statewide voter registration list that "contain[s] *all fields*," including "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Compl. ¶ 20; DOJ Ltr. 2. DOJ cited the NVRA, HAVA, and Title III of the CRA for authority for its records request, and stated that "[t]he purpose of this request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further in this regard or refer to any compliance deficiencies by New Mexico with respect to those statutes' voter list maintenance requirements. Compl. ¶¶ 19–20; DOJ Ltr. 2–3. DOJ requested that this full and unredacted copy of New Mexico's state voter registration list be provided within fourteen days. DOJ Ltr. 3–4.

---

[2] All page cites to documents filed by the United States in this case use the ECF-generated page numbers, located at the top right of each document.

On September 22, 2025, the Secretary agreed to provide a redacted copy of New Mexico's requested state voter registration list. Letter of Maggie Toulouse Oliver to Harmeet K. Dhillon at 2 (Sept. 22, 2025), ECF No. 2-4 ("NM SOS Ltr."). She also emphasized that New Mexico "fully complies with all requirements of the" NVRA, HAVA, and CRA, and that it "respects the Attorney General's authority to enforce the 'uniform and nondiscriminatory election technology and administration requirements' set out in HAVA and to request information necessary to ascertain New Mexico's compliance with list maintenance requirements in the NVRA." *Id.* at 2. But the Secretary explained that, before she could "provide an unredacted electronic copy of voter records and information in additional fields," she was "obligated by law to request further information, communication, and assurances of privacy protection from DOJ." *Id.* at 2.

First, the Secretary explained that, "[u]nder New Mexico law," she must "redact certain information from the voter registration list before it is made available for inspection, including social security numbers, full dates of birth, driver's license numbers, and contact information of participants in the confidential address programs such as victims of domestic violence and public officials." NM SOS Ltr. 2 (citing N.M. Stat. § 1-4-5.5 (2015); N.M. Stat § 66-2-7.1 (2025); N.M. Stat. §§ 1-6C-2, 1-6C-4 (2023); N.M. Stat. § 40-13B-1 (2024); N.M. Stat § 1-1-27.1 (2023); N.M. Stat. § 1-4-18.1 (2015)).

Second, the Secretary addressed DOJ's claimed sources of authority—the NVRA, HAVA, and the CRA—and why they did not authorize the demand for a full and unredacted copy of New Mexico's state voter registration list. *Id.* at 2. Particularly relevant here, the Secretary took the position that "the CRA requires a statement of the basis and purpose of accessing a full electronic list of sensitive and confidential personal data," and that DOJ had "made no attempt to explain why" evaluating New Mexico's compliance with list maintenance requirements in the

NVRA "would require the inspection of unredacted private voter information that is otherwise protected by New Mexico law." *Id.* at 2. The Secretary also expressed concerns "about whether DOJ's request complies with the requirements of the Privacy Act of 1974," and requested further information about "DOJ's purpose for creating this system of records, why 'all fields' are necessary to fulfill this purpose, and how DOJ intends to protect this information against any further dissemination disallowed by the Privacy Act." *Id.* at 3.

Neither the Complaint, nor the documents the United States incorporates by reference or any documents in the public record, indicate that DOJ ever responded to the Secretary's September 22 letter or provided any additional legal arguments to support its position or address the Secretary's objections and concerns. Instead, months later on December 11, 2025, the United States responded by filing this lawsuit, which is now one of at least twenty-four that DOJ has initiated recently to compel states and election officials to disclose sensitive voter data.[3]

Notably, according to public reporting, DOJ's requests for private, sensitive voter data from New Mexico and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be in connection with unprecedented efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize

---

[3] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/6QP2-8ZXC; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/HHJ7-JWQQ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/TQ5T-FB2A; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating in these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*; *see also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09. One recent article extensively quoted a lawyer who recently departed from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it:

> "We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division."

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result

6

of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[4] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has promoted the use of artificial intelligence to challenge registered voters.[5] These actors, including some associated with Honey, have previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group affiliated with current DHS official Honey challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA, was meritless).[6]

---

[4] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[5] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[6] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck and Katie

DOJ's actions also indicate that it may focus on or target specific groups of voters in its use of the requested data. In letters to other states requesting the same private voter data, DOJ also requested information about how elections officials, among other things, process applications to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or citizenship status.[7]

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. Nor can "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," survive a motion to dismiss. *Id.* at 678–79.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if true, state a claim to relief that is plausible on its face. *Hakeem v. Lamar*, 493 F. Supp. 3d 1038, 1043 (D.N.M. 2020) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

[7] *See also* Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 25-cv-01666 (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

544, 570 (2007); *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). Moreover, "'plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citations omitted). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*

To perform this review, courts can consider "[f]acts subject to judicial notice" and "documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," in addition to the information within the four corners of the complaint. *Duprey v. Twelfth Jud. Dist. Ct.*, 760 F. Supp. 2d 1180, 1193 (D.N.M. 2009).

## ARGUMENT

## I.    THE UNITED STATES' DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW.

The United States' demand for New Mexico's full and unredacted electronic voter file exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing

eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The United States' records request here is contrary to the CRA for at least two distinct reasons. *First*, in making this sweeping demand for New Mexico's full and unredacted state voter registration list, the United States fails to offer a statutorily sufficient statement of "the basis and the purpose" in support of its records requests. *Second*, to the extent the United States may be entitled to any records under the CRA, those records should be redacted to vindicate the privacy and constitutional rights of New Mexican voters. Nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters.

### A.    The United States' Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA.

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative."

*Id.* § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphases added).

The federal government's requests to New Mexico fail to provide "a statement of the basis and the purpose" sufficient to support disclosure of the unredacted voter file. *Id.* Contemporaneous case law immediately following the enactment of Title III of the CRA shows that the "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law and the "purpose" explains how the requested records would help determine if there is a violation of the law. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962). Indeed, "basis" and "purpose" under Title III of the CRA have consistently been treated as distinct concepts. *See id.*; *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). As set forth below, the United States' failure to articulate both a sufficient "basis" and "purpose" underlying its request for the unredacted voter file warrants dismissal of the CRA claim.

The United States alleges that the "purpose" of its request seeking "an electronic copy of New Mexico's complete and current [voter registration list]" was "to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 20; DOJ Ltr. 2. But neither the Complaint nor the DOJ Letter that invoked the CRA supplies a "basis" for why the United States believes New Mexico's list maintenance procedures might violate the NVRA or HAVA in the first place. And neither the Complaint nor the DOJ Letter alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in the data New Mexico reported to the U.S. Election Assistance Commission. *See* Compl. ¶¶ 17–18; DOJ Ltr.

Moreover, even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the vast scope of its records request here, seeking the full and

unredacted New Mexico statewide voter file. It does not attempt to explain why *unredacted* voter files are necessary to determine whether New Mexico has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12. And in fact, such unredacted files are not necessary: A single snapshot of a state's voter list does not and could not provide the information needed to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See* 52 U.S.C. § 20507(a)(4), (c)(1); *id.* § 21083(a)(2)(A); *id.* § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on New Mexico's voter list at a single point in time, that would not amount to New Mexico failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[8] For these reasons, the United States' demand failed on its face to meet the basis and purpose requirements of the CRA.

The basis and purpose requirements under the CRA are critical safeguards. They prevent the statute from being used as a fishing expedition to obtain records for

---

[8] Indeed, the inclusion at any particular point in time on New Mexico's voter registration list of some voters who may have potentially moved out of state is to be expected, since Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. The statutory basis and purpose requirements are not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. In the context of administrative subpoenas, and specifically in assessing an analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *United States v. Powell*, 379 U.S. 48, 57 (1964), and that such subpoenas "may not be so broad so as to be in the nature of a 'fishing expedition,'" *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988). Indeed, courts have explained that such a purpose requirement ensures that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation pursuant to an administrative subpoena).

As such, even if some portion of the voter file were necessary to investigate "New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 20; DOJ Ltr. 2, the United States has not provided any justification for why the full *unredacted* voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018), https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). The United States' failure to articulate the basis and the purpose for its demand for the full and unredacted voter file in particular is another ground to hold its demand insufficient as a matter of law.

13

Title III's basis and purpose requirement is moreover especially important here, where massive amounts of public reporting and public, judicially noticeable documents show that DOJ in fact did not disclose the main basis and purpose for its demand for New Mexico's full and unredacted voter file: building an unprecedented national voter file for its own use, to be shared with other agencies like DHS for unlawful purposes. *See supra* 5–8 & nn.2–4 (describing this reporting in detail). The creation of such a database has never been authorized by Congress, and indeed likely violates the federal Privacy Act. *See* 5 U.S.C. § 552a (e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote).

DOJ's failure to fully and accurately provide this information is fatal to its Complaint. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request. 52 U.S.C. § 20703 (emphases added). By twice using the definite article here, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). This is yet another ground for dismissal.

Moreover, and even setting aside this fatal deficiency, compliance with the NVRA and HAVA also cannot be the true basis and purpose for the data requests at issue here based on the United States' own more recent statements to states in connection with the requests. In particular, the United States has represented in court that it intended for a number of states to sign a memorandum of understanding ("MOU") as to its requests for state voter files. Hr'g Tr. at 72:21–73:8, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Dec. 4, 2025). And far from ensuring compliance with the NVRA and HAVA, the MOU that the United States has asked states to enter

into *runs afoul* of those statutes. *See* Mot. to Intervene, Ex. 5, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU").

As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A), and indeed the NVRA itself is structured so that potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake, *id*. § 20507(d)(1)(B). But the MOU indicates multiple contemplated violations of those statutory requirements. First, the United States seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statutory text, *id*. § 21085 (methods of complying with HAVA "left to the discretion of the State"). MOU at 2, 5. Second, its substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, 52 U.S.C. § 20507. This MOU demonstrates that the United States' supposed purpose is not in compliance with federal law but aggrandizing authority to a federal agency that is contrary to federal law.[9]

Under the circumstances here, the United States' invocation of Title III of the CRA fails in myriad ways to provide a sufficient "statement of the basis and the purpose" for its demand, and accordingly does not comply with the CRA. Dismissal is proper.

### B.    Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter.

Even had the United States provided a valid basis and purpose sufficient to support its demands—which it did not—any sensitive personal voter information would still be subject to redaction. The text of Title III of the CRA does not prohibit

---

[9] Dismissal on the grounds set forth above would also be proper under Federal Rule of Civil Procedure 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Federal Rule of Civil Procedure 56.

redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote.

As noted, to justify its demand for data under Title III of the CRA, the United States claims it is investigating New Mexico's compliance with federal election laws, including the NVRA and HAVA. Compl. ¶¶ 18, 20. The United States also discusses additional requirements of the NVRA and HAVA, including the NVRA's requirement in Section 8(i) to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" upon request. 52 U.S.C. § 20507(i); Compl. ¶¶ 10–15. Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to records under the NVRA. Voting rights advocates have consistently relied on the NVRA to investigate infringements on the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at historically Black university).

While the United States does not rely on Section 8(i) of the NVRA for its demand for data in this lawsuit, the cases interpreting this provision are instructive, as courts have consistently found that the information required to be disclosed under the NVRA has limits. These courts have consistently permitted—and in some instances required—states to redact sensitive personal data of voters when disclosing information under the NVRA. Failure to do so can violate the fundamental right to vote protected by the Constitution.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. § 20703; § 20507(i)(1). Courts must

interpret the disclosure provisions in these statutes in a manner that does not unconstitutionally burden the right to vote. *See Olmos v. Holder*, 780 F.3d 1313, 1320–21 (10th Cir. 2015) ("the canon of constitutional avoidance . . . provides that when a particular construction would raise serious constitutional problems, the court will avoid that construction" (citation omitted)). Federal courts throughout the country have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and even in some cases require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and as such, "the proper redaction of certain personal information in the Voter File can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019). In New Mexico, for example, state election law includes express protections from disclosure for social security numbers, day and month of birth, driver's license numbers, and contact information of participants in the confidential address programs such as

victims of domestic violence and public officials. *See* N.M. Stat. § 1-4-5.5(B) (2015); N.M. Stat. § 1-4-50 (2011); N.M. Stat § 66-2-7.1 (2025); N.M. Stat. §§ 1-6C-1, 1-6C-2, 1-6C-4 (2023); N.M. Stat. §§ 40-13B-1, 40-13B-2, 40-13B-8 (2024); N.M. Stat § 1-1-27.1 (2023).

Redaction may also be affirmatively required to the extent the disclosure of such sensitive material would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). The Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying, ensured the redaction of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[10] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a records request under Title III of the CRA, multiple considerations not at issue in that case but which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III of the

---

[10] The United States itself has explained—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae at 11, 25–26, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *11, *25–26.

CRA must be interpreted to avoid this unconstitutional burden. *See id.*; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on New Mexico voters and good-government civic groups like Common Cause is present here. *See* Mot. to Intervene, Ex. 2, Decl. of Molly Swank ¶¶ 11–14; Ex. 3, Decl. of Claudia Medina ¶¶ 8–10; Ex. 4, Decl. of Justin Allen ¶¶ 9–10.

As with any requester of records, the United States would be afforded access to voting records under Section 8(i) of the NVRA. But federal court precedent is clear that this access is not unfettered and instead must always be balanced against privacy protections that are vital to ensuring citizens retain their fundamental right to vote. The same privacy and constitutional concerns that federal courts have found warrant redactions under NVRA records requests apply equally to requests for the same records under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). Indeed, the limited case law considering records requests under the CRA expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.

Thus, even were the United States entitled to records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information, including Social Security numbers and driver's license numbers, should similarly be redacted. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted).

## II.  THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.

The United States makes expansive claims that Title III of the CRA universally "displaces the Federal Rules of Civil Procedure," instead "creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute" was made, "explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. in Supp. of U.S. Mot. to Compel Prod. of Records, ECF No. 2-2 ("Mot. to Compel") at 4–5; *see also* Compl. ¶¶ 1–4. This argument rests entirely on a single set of non-binding cases decided more than sixty years ago, in the early 1960s, in a different circuit and a drastically different historical context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel; *see also* Compl. ¶¶ 1–4.

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel at 4 n.1. But the United States does not provide key historical context that could help explain why this provision of the CRA would have been addressed primarily in the Fifth Circuit—which at the time those cases were decided, during the Jim Crow era, included the southern states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[11] In these states, it was widely known that many election officials were recalcitrant in their refusal to register Black voters.[12] It was against this particular backdrop that the Fifth Circuit in *Kennedy v. Lynd* fashioned

---

[11] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[12] *See generally*, *e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

an expedited, summary procedure for enforcing CRA records requests in those early 1960s cases. In the face of Jim Crow regimes that were using every possible means to block Black Americans from registering to vote, including resistance from judges, the Fifth Circuit in *Lynd* noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. In that context, "the factual foundation for" the basis and purpose of the Attorney General's request was utterly self-evident, and thus plenary consideration was not required. *See id.* The Fifth Circuit's treatment of Section 303 of the CRA cannot be divorced from that context.[13]

By contrast, here, more than sixty years later, the context of *this* records request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive, non-public personal identifying information. Even more alarming, there is extensive reporting that the purported basis and purpose of DOJ's request are likely pretextual, and that the data at issue is in fact being sought for unlawful ends.[14]

Nothing in the text of Title III of the CRA insulates the sufficiency of the requirement for a "statement of the basis and the purpose" of a demand from standard judicial review—especially not in the circumstances presented here. *See* 52 U.S.C.

---

[13] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

[14] *See supra* 4–7 & nn.2–4 (citing, *inter alias*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html; Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html).

§ 20703. Indeed, in the more than sixty years since *Kennedy v. Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (citation and quotation marks omitted); *see also, e.g.*, *Powell*, 379 U.S. at 57–58 (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case). *Powell* is especially on point. There, just two years after *Lynd*, the Court held that proceedings to enforce a statute providing the United States with the power to request records in terms that are materially identical to the CRA were governed by the Federal Rules. *Powell*, 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data[.]" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)). The United States' demand for a summary resolution to this case, with no discovery into whether it has a proper statutory basis for its demand, flies in the face of a half-century of precedent as well as the Federal Rules.

Furthermore, even in *Kennedy v. Lynd*, the court in explaining its findings noted that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate

reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." 306 F.2d at 231. The court also noted that Section 305 of the CRA authorizes only jurisdiction by "appropriate process" to compel document production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information such as that at issue in this case. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230. Thus, even in the 1960s, before sensitive personal identifying information such as Social Security Numbers or driver's license numbers were widely collected as part of the voter registration record, and before federal laws had been passed to protect and constrain access to personal information,[15] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated the possibility that the "duty to issue protective orders" would arise for certain records requests under the CRA, *id.* at 230.

Here, the Secretary has already agreed to provide the *public* records requested by the United States, but has simply declined to provide the "confidential, private" personal identifying information of New Mexico voters that would *not* ordinarily be open to reasonable inspection. *Id.* at 231. To argue that the United States is entitled to summary relief and the forced provision of an unprecedented trove of "confidential, private" information, without *any* review of its statutorily required statement of the basis and the purpose for its demand, would go even further than *Lynd* did in the context of the 1960's Jim Crow South, where, very much unlike here, the federal basis

---

[15] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

and purpose for the requested voter data were inarguably clear and not apparently pretextual or unlawful. The United States' attempt to end-run the Federal Rules and the CRA's requirements must be rejected.

As the court presiding over the federal government's similar action in California has already recognized, the United States' motion to compel seeks "to reach the ultimate question in this case regarding the production of records," and "thousands of voters' lives will be impacted by this case." Hr'g Tr. at 5:3–9, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Dec. 4, 2025). That court continued: "And the Court will not be setting the matter on any legal -- I don't want to say gamesmanship, but therefore, the motion for order to produce records pursuant to 52 U.S.C. 20701 is denied." *Id.* This Court should follow suit.

## CONCLUSION

The United States' request for New Mexico's full and unredacted electronic voter file should be denied and the Complaint dismissed.

Dated: January 13, 2026

Megan C. Keenan*
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
(347) 714-1530
mkeenan@aclu.org

Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org

Respectfully submitted,

/s Maria Martinez Sanchez

Maria Martinez Sanchez
American Civil Liberties Union
Foundation of New Mexico
P.O. Box 566
Albuquerque, NM 87103
(505) 266-5915
msanchez@aclu-nm.org

* *application for admission pro hac vice forthcoming*

24

*Counsel for Intervenor-Defendants Common Cause,*
*Claudia Medina, and Justin Allen*

## <u>CERTIFICATE OF CONFERRAL</u>

I hereby certify, pursuant to Local Rule 7.1(a), that counsel for Common Cause, Claudia Medina, and Justin Allen sought the parties' position on the foregoing motion. Defendant New Mexico Secretary of State consents to the motion. Intervenor-Defendant New Mexico Alliance for Retired Americans is unopposed to the motion. Plaintiff United States opposes the motion.

<u>/s Maria Martinez Sanchez</u>
Maria Martinez Sanchez

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record.

<u>/s Maria Martinez Sanchez</u>
Maria Martinez Sanchez