## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        *Plaintiff*,

v.

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of New
Mexico,

        *Defendant*,

and

NEW MEXICO ALLIANCE FOR RETIRED
AMERICANS, COMMON CAUSE,
CLAUDIA MEDINA, and JUSTIN ALLEN,

        *Intervenor Defendants*.

Case No. 1:25-cv-01193-LF-JFR

**Oral Argument Requested**

## DEFENDANT NEW MEXICO SECRETARY OF STATE MAGGIE TOULOUSE OLIVER'S BRIEF IN OPPOSITION TO THE UNITED STATES' MOTION TO COMPEL

# TABLE OF CONTENTS

I.    Introduction ................................................................................................. 1

II.   Background ................................................................................................... 2

III.  Argument ................................................................................................... 11

   A.   A statute must expressly call for use of "special proceedings" to displace default
   application of the Federal Rules of Civil Procedure. .................................................. 11

      1.   DOJ's sole authority for application of a special proceeding in Title III suits is an out-
      of-circuit case has been overruled by the Supreme Court and disavowed by the Court of
      Appeals that issued the decision. ............................................................... 11

      2.   Title III of the Civil Rights Act does not expressly authorize a "special proceeding" as
      required to set aside use of the Federal Rules. ................................................. 13

      3.   Use of special proceedings is not warranted because the Federal Rules do not conflict
      with Title III's purpose. ...................................................................... 16

   B.   Regardless of applicable procedure, the DOJ's faulty request for records should be denied
   and this motion denied as moot. ...................................................................... 18

   C.   Even if the DOJ's request is not facially inadequate, the Court should allow the
   development of an adequate record to decide the Secretary Toulouse Oliver's affirmative
   defense of avoidance of illegality. ................................................................... 18

IV.   Conclusion ................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18 (1st Cir. 2022) . . . . . . . . . . . . . . .20

*Becker v. United States*, 451 U.S. 1306 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Booth v. Hume Publ'g., Inc.*, 902 F.2d 925 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Daly v. United States*, 393 F.2d 873 (8th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16, 17

*Estrada v. Cook*, 166 F. Supp. 3d 1230, 1238 (D.N.M. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Glen 6 Assocs., Inc. v. Dedaj*, 770 F. Supp. 225 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Application of Chevron Corp.*, 736 F. Supp. 2d 773 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . .15

*Katzenbach v. McClung*, 379 U.S. 294 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 12, 13

*League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946 (CKK),
    2025 WL 3042704 at *32 (D.D.C. Oct. 31, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*S.E.C. v. Wencke*, 783 F.2d 829 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Powell*, 379 U.S. 48 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 11, 12, 15, 17

*Voter Reference Found., LLC v. Torrez*, No. 24-2133, 2025 WL 3280300 (10th Cir. Nov.
    25, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026) . . . 7

*Weems v. McCloud,* 619 F.2d 1081 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes**

5 U.S.C. § 552a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

9 U.S.C. § 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

9 U.S.C. § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

9 U.S.C. §12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

26 U.S.C. § 7604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 1782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

42 U.S.C. § 2000a-5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 2000a-5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

44 U.S.C. § 3507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

52 U.S.C. §§ 20501–20511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

52 U.S.C. § 20507(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

52 U.S.C. § 20701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

52 U.S.C. § 20703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 20

52 U.S.C. § 20705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 15, 17

52 U.S.C. §§ 20901–21145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

52 U.S.C. § 21083(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20

N.M. Stat. Ann. §1-1-27.1 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

N.M. Stat. Ann. §1-4-2(A) (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.M. Stat. Ann. §1-4-5.4 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

N.M. Stat. Ann. §1-4-5.5(B) (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

N.M. Stat. Ann. §1-4-18.1 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 4

N.M. Stat. Ann. §1-4-28 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.M. Stat. Ann. § 1-4-34 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

N.M. Stat. Ann. §1-4-38 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.M. Stat. Ann. §1-4-47(B) (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

N.M. Stat. Ann. §1-5-3 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.M. Stat. Ann. §1-6C-4 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

N.M. Stat. Ann. § 40-13B-3 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

N.M. Stat. Ann. § 66-2-7.1(A) (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Title III of the Civil Rights Act of 1964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Regulations**

90 Fed. Reg. 48948 (Oct. 31, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.M. Code R. § 1.10.8.12 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

N.M. Code R. § 1.10.35.8 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 6

N.M. Code R. § 1.10.35.9 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 6

**Rules**

Fed. R. Civ. P. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Other Authorities**

*ERIC Project FAQs*, New Mexico Secretary of State, https://www.sos.nm.gov/voting-and-elections/voter-information-portal-nmvote-org/eric-project-faqs/. . . . . . . . . . . . . . . . . . . . . . . .6

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 8

*How ERIC Works*, ERIC, https://ericstates.org/how-does-it-work/.. . . . . . . . . . . . . . . . . . . . 6

Jonathan Shorman, *DOJ is sharing state voter roll lists with Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

Sarah N. Lynch, *US Justice Dept considers handing over voter roll data for criminal probes, documents show*, Reuters (Sept. 9, 2025), https://www.reuters.com/legal/

government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## I.    Introduction

As demonstrated in Defendant Secretary of State Maggie Toulouse Oliver's Motion to Dismiss, filed contemporaneously herewith, the U.S. Department of Justice's ("DOJ's") demand for a complete, unredacted copy of New Mexico's entire voter registration database is not authorized by the statute on which the DOJ relies (Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20701 *et seq.*) and, further, violates New Mexicans' privacy rights under state and federal laws. While the filing of a motion to dismiss does not typically support staying discovery, here the motion to compel would effectively resolve the merits of the case. Therefore, Secretary Toulouse Oliver requests this motion be taken up after the Motion to Dismiss decision. If the Court determines that the DOJ has failed to state a claim, this motion is moot. But should the Court deny or defer ruling on Defendant's Motion to Dismiss, the Court should nevertheless reject the extraordinary and fundamentally unfair process by which the DOJ seeks adjudication of its claim.[1]

The DOJ's motion to compel represents an end-run around the Court's merits ruling and rests on a misinterpretation of the Civil Rights Act of 1960 ("CRA"). The CRA does not authorize a so-called "special proceeding" for compelling production of sensitive voter data. The DOJ's motion should be denied on that basis alone. But even if this Court finds that the CRA allows a special procedure, the CRA does not displace or allow the DOJ to circumvent the Federal Rules of Civil Procedure ("Federal Rules"), which protect a fair judicial process and entitles Secretary

---

[1] Preliminarily, Secretary Toulouse Oliver notes that the DOJ submitted an unsigned declaration in support of its motion to compel. Declaration of Maureen Riordan, Docket 2-1. An unsigned declaration does not constitute evidence and cannot be relied upon. *See Estrada v. Cook*, 166 F. Supp. 3d 1230, 1238 (D.N.M. 2015) ("Even an unsworn declaration must be signed 'under penalty of perjury' to have the same force and effect as an affidavit."). The court may strike the declaration and deny the DOJ's motion simply on the basis that it fails to provide any evidence. *See id.* at 1239 (striking an unsigned "affidavit").

1

Toulouse Oliver to develop an adequate record to oppose a dispositive motion. Allowing the DOJ the relief it requests in its motion would create an extraordinary exception to judicial procedure and result in an unjust resolution: the exposure of the private, sensitive data of over one million New Mexicans without the procedural safeguards of adjudication.

At the very least, should the Court find the DOJ's Complaint is adequately stated and a summary proceeding applies, the record is insufficient for the Court to make an informed ruling on Secretary Toulouse Oliver's affirmative defenses. Secretary Toulouse Oliver plans to exercise her right to request discovery on her affirmative defenses—namely that the DOJ has failed to comply with federal privacy laws. If the DOJ has not taken federally mandated steps to safeguard sensitive voter data, it is barred from compiling private information about every New Mexican voter.

In short, the Court should deny the DOJ's extraordinary motion and instead treat this case like typical civil litigation subject to the Federal Rules. Secretary Toulouse Oliver requests oral argument on this motion.

## II.    Background

### *New Mexico's Voter Registration List*

The New Mexico Secretary of State's office maintains the State's Voter Registration List ("VRL"), which contains personally identifiable information ("PII") on each of New Mexico's 1,396,404 voters. Declaration of Mandy Vigil ("Vigil Decl."), attached as Exhibit 1 ¶ 6, 10. The VRL contains many data fields, including the voter's name, residence address, mailing address, past addresses, phone number, email address, current party enrollment, date of birth, and voter participation history. Vigil Decl., ¶ 9. Each voter registration also contains the voter's full social

security number, driver's license number, or nondriver identification card number, which is used for identity verification. *Id*. The VRL is generated from a specialized, secure database known as SERVIS ("State Elections, Registration & Voting Integrity Systems"). Vigil Decl., ¶ 6–7. SERVIS receives PII from completed voter registration application forms. N.M. Stat. Ann. § 1-4-5.4 (2019) (describing contents and use of voter registration forms), N.M. Stat. Ann. § 1-4-2(A) (2019) (explaining methods for submission of registration forms); N.M. Code R. § 1.10.35.8 (2001) (describing procedures for processing and verifying voter registrations). Individuals may also register during certain transactions with the state, such as when applying for or renewing a driver's license with the New Mexico Motor Vehicle Division ("MVD"). N.M. Stat. Ann. §§ 1-4-2(A), 1-4-18.1 (2015).

A voter's individual file in SERVIS includes data from the voter registration certificates, as well as additional information like voting precinct and district and therefore provides more information about each voter than does the VRL. The data fields in SERVIS include the voter's name, physical address, mailing address, phone number (at the voter's option), email address (at the voter's option), current party affiliation, date of birth, date of registration, and history of all state and local elections in which the voter has participated. Vigil Decl., ¶ 9; *see also* N.M. Stat. Ann. §§ 1-4-5.4(B), 1-4-47(B) (2023); N.M. Code R. § 1.10.35.8(A)(4).

The Secretary of State's Office can generate registration information in list form from SERVIS, but is prohibited from publicly releasing certain voter information, particularly PII. Specifically, New Mexico law requires the redaction of social security numbers, full dates of birth,

and driver's license numbers. *See* N.M. Stat. Ann. §§ 1-4-18.1(H); [2] 1-4-5.5(B) (2015), 66-2-7.1(A) (2007). State law provides additional protections for participants in confidential address programs, such as public officials and victims of domestic violence. *See id.* §§ 1-6C-4 (2019) (detailing voter registration protections for intimate partner violence survivors); 40-13B-3 (2023) (protections against disclosure for victims of domestic violence); 1-1-27.1 (2023) (allowing elected and appointed officials to designate personal information submitted as part of an election as confidential). Thus, New Mexico's publicly disclosed voter registration lists include only a registrant's full name, gender, address (if not confidential), birth year, phone number (only if permitted by the voter), political party affiliation, registration date, voting history, and voting county, precinct, and district information. Vigil Decl., ¶ 9, 11.

*Voter List Maintenance*

The National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §§ 20501–20511, and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. §§ 20901–21145, outline steps states must take to maintain the accuracy and currency of their voter lists. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change in residence. 52 U.S.C. § 20507(a)(4). Subject to certain restrictions designed to protect voters from being wrongfully purged from voting lists, the NVRA leaves it to the states to design and operate its list maintenance program as it sees fit. *See id.* § 20507(a).

---

[2] While the Tenth Circuit recently decided subsections (C) and (E) are preempted by the NVRA, the court there made clear that subsection (B) remained valid. *See Voter Reference Found., LLC v. Torrez*, No. 24-2133, 2025 WL 3280300 (10th Cir. Nov. 25, 2025) ("To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation." (citing subsection (B)).

HAVA's voter list maintenance requirements build on and overlap with those of the NVRA, requiring states to adopt "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4)(A). HAVA also directs each state to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." *Id.* § 21083(a)(1)(A). The statute further provides that any State system for maintaining voter registration lists "shall be conducted in a manner that ensures that . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list." *Id.* § 21083(a)(2)(B). Within this framework, the "specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." *Id.* § 21085.

The Secretary of State's Office uses SERVIS to maintain the official voter registration list in compliance with the NVRA and HAVA. *See* N.M. Stat. Ann. § 1-5-3 (2005); N.M. Code R. § 1.10.35.9 (2025). A Board of Registration in each county is charged with reviewing the list of eligible voters by no later than mid-March following a general election and directing the county clerk to cancel the registration of any voter who has failed to respond to a mailed confirmation notice and has failed either to appear to vote or confirm in writing of a change in residence. N.M. Stat. Ann. §§ 1-4-28(E) (2019), 1-4-34 (2023), 1-4-38 (2019). New Mexico state law sets forth the scenarios in which state officials must cancel registrations, including death, change in residence, and, under certain limited circumstances, by request of a voter. *Id.* §§ 1-4-22 (2019), 1-4-24 (2023), 1-4-25 (2009), 1-4-28 (2019), 1-4-30 (2023). State regulations contain detailed instructions for

confirming the accuracy of its voter registration list, including through the use of duplicate searches and confirmation mailings to voters to verify residence, comparison of the voter registration list against state and federal felony incarceration records to confirm eligibility, and reliance on New Mexico Department of Health records to identify deceased voters. N.M. Code R. §§ 1.10.35.8, 1.10.35.9, 1.10.8.12 (2001).

New Mexico also participates in the Electronic Registration Information Center ("ERIC"), which stores voter data from multiple states in an encrypted and non-identifiable form. *See ERIC Project FAQs*, New Mexico Secretary of State, https://www.sos.nm.gov/voting-and-elections/voter-information-portal-nmvote-org/eric-project-faqs/ (last visited Jan. 12, 2026). ERIC continuously compares New Mexico's voter data with myriad other data sources to flag potentially inaccurate registrations. *See How ERIC Works*, ERIC, https://ericstates.org/how-does-it-work/ (last visited Jan. 12, 2026). ERIC helps the Office identify registrants who have moved or died, or who have duplicate records in the voter list. *See id.* Staff review each registration flagged by ERIC to confirm the results and make any necessary corrections. Vigil Decl., ¶ 15.

Notably, the data New Mexico transmits to ERIC is fundamentally different from the voter data sought by the DOJ through this litigation and its underlying demands to Secretary Toulouse Oliver. Prior to transmission to ERIC, voter data is encrypted into deterministic character strings called "hashes." The hashing process allows ERIC to determine whether the transmitted data match data from other sources, including data from other participating states, without having to specifically identify the individual whose data is under review. *Id.* The data the DOJ currently seeks, *i.e.*, unencrypted voter PII, is simply not available in or via ERIC.

*Recent Efforts to Collect Voter Registration Information Nationwide*

In March 2025, President Trump issued an Executive Order ("EO") titled "Preserving and Protecting the Integrity of American Elections." *See* Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025). In addition to attempting to create a requirement that individuals using the federally issued voter registration application must submit documentary proof of citizenship—a provision whose enforcement has since been enjoined by multiple federal courts—the EO directed federal agencies to analyze state voter-list data. Specifically, the EO stated that

> the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

*Id.* at §2(b)(iii).[3]

Two months later, in May 2025, the DOJ began requesting voter data from states. To date, the DOJ has demanded that at least forty-three states and the District of Columbia supply their complete voter registration lists. In a private meeting with the National Association of Secretaries of State in August 2025, Deputy Attorney General Michael Gates stated that the DOJ would eventually make such requests to all fifty states. Declaration of Sharon Pino ("Pino Decl."), attached as Exhibit 2 ¶ 6; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks*

---

[3] Court have enjoined other sections of this Executive Order as unconstitutional. *See Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026) (permanently enjoining Sections 2(a), 4(a), 4(b), 7(a), and 7(b)); *League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946 (CKK), 2025 WL 3042704 (D.D.C. Oct. 31, 2025) (permanently enjoining Section 2(a)); *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) (preliminarily enjoining Sections 2(a), 3(d), 2(d), 7(b), and partially, 7(a)).

*to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. He further specified that, in collecting this data, the federal government aimed to obtain the last four digits of every voter's Social Security number. Barrett & Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll.*

In September 2025, the New York Times reported that the federal government planned to compare the voter registration data to immigration data maintained by the Department of Homeland Security ("DHS"). *Id.* Around the same time, Reuters reported that the DOJ was in talks with the DHS about a partnership in which DOJ would compile the voter data that the DOJ had collected from states and transfer it to the DHS "for use in criminal and immigration-related investigations." Sarah N. Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, Reuters (Sept. 9, 2025), https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09/.

In October 2025, the DHS issued a Systems of Records Notice ("SORN") describing a significant expansion to the Systematic Alien Verification for Entitlements ("SAVE") Program. "Department of Homeland Security/U.S. Citizenship and Immigration Services (USCIS)-004 Systematic Alien Verification for Entitlements Program (SAVE)," 90 Fed. Reg. 48948 (Oct. 31, 2025). The SAVE program, which is operated by DHS, allows officials to search for individuals to determine their immigration status. Vigil Decl. ¶ 24. Earlier last year, DHS had altered the SAVE system to enable it to scan States' voter rolls if uploaded to the system and draw upon Social Security records, allowing users to employ the tool to confirm United States citizenship status.

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, (Sept. 12, 2025),       https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/.

By November 2025, the DOJ had not responded to Secretary Toulouse Oliver's offer to provide the federal agency the state's redacted voter registration list for inspection nor provided additional information as to the "basis or purpose" of its data demand. Vigil Decl. ¶ 22. Deeply "concern[ed]" about the new reports "that the [DOJ] has shared voter data with the [DHS]," Secretary Toulouse Oliver, along with Secretaries from nine other states, sent a letter to the U.S. Attorney General and the Secretary of Homeland Security in mid-November requesting further information about the intended use of the voter data sought from their states. Vigil Decl. ¶ 24. Among other things, the Secretaries expressed concern that the DOJ intended to feed voter data into the SAVE system for immigration enforcement purposes. *Id.* To date, neither the Attorney General nor the Secretary of Homeland Security has provided any written response to the letter.

On December 1, 2025, New Mexico's Secretary of State and Secretaries from eleven other states submitted a public comment on SAVE's expansion, stating opposition to the expansion of the SAVE program, on grounds that using it to verify voter eligibility is likely to misidentify eligible voters as non-citizens and to chill participation by eligible voters. Vigil Decl. ¶ 25.

*The DOJ's Demand for Unredacted Voter Data*

By letter dated August 14, 2025, Assistant Attorney General for Civil Rights Harmeet Dhillon sent Secretary Toulouse Oliver a demand for the state's voter registration list containing "all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number of the last four digits of the registrant's social security number." *See*

Exhibit B to Vigil Decl. The letter stated that the DOJ had already "received New Mexico's statewide voter registration list," even though the Secretary of State's Office had not sent the federal agency a voter registration list at any point during 2025.[4]

Secretary Toulouse Oliver responded on August 19, 2025, informing the DOJ that the office had not provided the voter registration list and inquired if the letter was in error. *See* Exhibit C to Vigil Decl. The DOJ did not respond and instead reiterated its request for voter registration list "with all fields" three weeks later. *See* Exhibit D to Vigil Decl. On September 22, 2025, Secretary Toulouse Oliver replied with an offer to provide access, either electronically or in-person, to the state's publicly available, redacted voter registration list.[5] *See* Exhibit E to Vigil Decl.

Secretary Toulouse Oliver explained that the state was legally precluded from providing the full voter registration list without certain redactions, adding that the NVRA – which the DOJ cited as part of the basis for its demand – does not require disclosure of PII. *See* Exhibit E to Vigil Decl. at 1 ("Under New Mexico law, I am required to redact certain information from the voter registration list before it is made available for inspection, including social security numbers, full dates of birth, driver's license numbers, and contact information of participants in the confidential address programs such as victims of domestic violence and public officials."). While the DOJ also invoked Title III as authorizing its demand, Secretary Toulouse Oliver pointed out that the statute

---

[4] It is not clear how the DOJ obtained New Mexico's voter registration list, so Defendant cannot evaluate whether or how the purported mystery disclosure may moot the instant proceedings. The Secretary of State's office received a request for the voter registration list from the Dhillon Law Group, a law firm founded by Harmeet Dhillon, in March 2025. *See* Exhibit B to Vigil Decl. The Secretary provided the voter registration list, with PII redacted. Vigil Decl. ¶ 18.

[5] For the Court's clarity, the only letter sent by Secretary Toulouse Oliver to the DOJ in September 2025 was dated September 22, 2025. *See* Exhibit E to Vigil Decl. The DOJ's references to a September 23, 2025, letter all appear to refer to the letter sent on the 22nd. *See* Compl. ¶¶ 25–26.

required the DOJ provide "a statement of the basis and purpose" for the demand. *Id*. The DOJ had stated that "[t]he purpose of this request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA," but had not identified any basis for the request such as alleged anomalies in New Mexico's voter registration list or deficiencies in the state's list-maintenance program. *See* Exhibit D to Vigil Decl. at 2. The DOJ did not respond and instead filed this action almost three months later.

## III. Argument

### A. A statute must expressly call for use of "special proceedings" to displace default application of the Federal Rules of Civil Procedure.

#### 1. DOJ's sole authority for application of a special proceeding in Title III suits is an out-of-circuit case has been overruled by the Supreme Court and disavowed by the Court of Appeals that issued the decision.

The DOJ's argument for a special proceeding rests exclusively on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), but that case is non-binding, has been overruled on this point by the Supreme Court in *United States v. Powell*, 379 U.S. 48 (1964), and is factually inapposite.

In *Lynd*, the DOJ requested from Jim Crow-era Mississippi and Louisiana certain voter information "to ascertain whether or not violations of Federal law in regard to registration and voting"—*i.e.*, the Civil Rights Act of 1957—"have occurred." 306 F.2d at 229 n.6. The Fifth Circuit in *Lynd* held that an "application" from the Attorney General for an order compelling documents did not begin a traditional civil action, but a special proceeding in which some rules of federal procedure did not apply. *Lynd*, 306 F.2d at 225–27. While *Lynd* illustrates the CRA's objective and the extent to which the DOJ now seeks to misuse Title III, *Lynd* does not reflect the

current state of the law governing this proceeding. Indeed, two years after *Lynd* was decided, the United States Supreme Court rejected the *Lynd* approach that DOJ seeks to invoke here. *Powell*, 379 U.S. at 58 n.18.

The Fifth Circuit itself retreated from *Lynd* nearly twenty years later in *Weems v. McCloud*, reasoning that Georgia law created a special statutory proceeding because the statute specified "the issues to be litigated and the procedure to be followed." 619 F.2d 1081, 1097 (5th Cir. 1980). Both such provisions are absent from Title III. *Weems* also reiterated the Supreme Court's observation in *New Hampshire Fire Insurance Company* that "courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law" absent "express statutory authorization," *Weems*, 619 F.2d at 1095 n.34 (citing *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 406 (1960)). Notably, *Lynd* has not been cited for the proposition that the CRA creates a special proceeding in over 40 years. Given the Supreme Court's rejection of *Lynd* in *Powell* and the Fifth Circuit's retreat from its own writings, that ruling is hardly instructive, let alone controlling.

Beyond whether *Lynd* remains good law on this issue, it is distinguishable on its facts. In *Lynd*, the Attorney General filed an "application," whereas here, the DOJ filed a traditional civil complaint and moved for an order to compel. *See* Docket No. 1. The *Lynd* court also stressed that, "[w]e think two things are of great importance . . . . First, we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Lynd*, 306 F.2d at 231. Here, the Secretary offered the DOJ a redacted voter roll—a public record that is routinely provided to researchers and interested members of the public. Vigil Decl. ¶ 22. But the DOJ is demanding

confidential information about voters—the type of record that *Lynd* stressed was outside its scope.

### 2. Title III of the Civil Rights Act does not expressly authorize a "special proceeding" as required to set aside use of the Federal Rules.

Title III of the Civil Rights Act of 1960 neither permits nor requires any special summary proceeding. In relevant part, the statute instructs that certain voting records be "made available for inspection" "upon demand in writing by the Attorney General," and that the demand "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. Title III also confers jurisdiction: the federal district court for the district in which the demand for records is made "shall have jurisdiction by *appropriate process* to compel the production of such record or paper." *Id.* § 20705 (emphasis added). Nowhere does Title III provide rules or procedures for a special proceeding, nor does it use the terms "special" or "summary" proceeding. *Cf. Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (confirming presumption that Federal Rules of Civil Procedure govern federal-government document demands).

Citing *Lynd*, the DOJ argues that Title III somehow displaces the standard federal process as defined by the Federal Rules of Civil Procedure, effectively giving the federal government unlimited subpoena power, depriving the Court of its authority to supervise discovery, and negating states' rights to challenge federal overreach. *See Memorandum in Support of the DOJ's Motion to Compel*, Docket 2-2 at 11. The DOJ's conjured procedure means that once it provides a simple description of a demand for sensitive data under Title III, the Federal Rules do not apply, and this Court must order whatever relief the DOJ requests. However, case law is clear – deviation from the Federal Rules is only permitted when plainly required by statute. As the Supreme Court has

explained, absent "express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law." *N.H. Fire Ins. Co.*, 362 U.S. at 407. Express statutory authorization consists of "procedures and remedies specifically tailored to a limited subset of cases." *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 166 (2d Cir. 2006). The CRA's Title III contains no such express statutory authorization.

Comparing Title III's provisions and those of the Federal Arbitration Act ("FAA") or Civil Rights Act of 1964—statutes that courts have found to authorize special proceedings—is illustrative. The FAA sets forth detailed procedures designed to circumvent normal judicial process, including detailed petition procedures, 9 U.S.C. § 9; award modification rules, 9 U.S.C. §12; and limitations on the form of relief requested, 9 U.S.C. § 6. The Federal Rules are displaced only because the statute unmistakably, expressly provides for special proceedings. *Cf. Booth v. Hume Publ'g., Inc.*, 902 F.2d 925, 931–32 (11th Cir. 1990). Similarly, the Supreme Court concluded that the 1964 Civil Rights Act created a special proceeding in light of the statute's plain text enumerating commencement procedures and unique pleading rules, 42 U.S.C. § 2000a-5(a); specifying a unique forum through a three-judge panel, 42 U.S.C. § 2000a-5(b); and circumventing normal appeal rules by creating a right of direct appeal to the Supreme Court, *id. See also Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (explaining that ordinary judicial process does not apply because "Title II [of the Civil Rights Act of 1964] provides for such a statutory proceeding for the determination of rights and duties arising thereunder"). Title III, meanwhile, lacks any comparable framework. Viewed next to the detailed procedures set forth in the FAA or the 1964 Civil Rights Act, Title III states only that the DOJ must pursue its investigative demands through "appropriate process."

If anything, Title III's "appropriate process" language requires normal judicial process rather than circumvention of it. The language matches provisions in the tax code found *not* to create a special proceeding. The tax code allows the Internal Revenue Service to issue summons for testimony and records and enforce the summons "by appropriate process" in district court. 26 U.S.C. § 7604(a). The Supreme Court has held that since the tax code "contains no provision specifying the procedure to be followed," no special proceeding is authorized and "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. The Court warned against attempts to subvert the standard Federal Rules: "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Id*. at 58.

So too here. The DOJ invokes the Court's process to enforce an investigative demand while seeking to abuse that process by preventing any meaningful judicial review. Just as in *Powell*, Title III allows the enforcement of a request for records "by appropriate process." 52 U.S.C. § 20705. Nothing in Title III's unremarkable grant of jurisdiction says that cases arising under the statute are exempt from the Federal Rules or immune from searching judicial review, as the DOJ insists. *Cf. In re Application of Chevron Corp*., 736 F. Supp. 2d 773, 786 n.56 (S.D.N.Y. 2010) (deeming action to compel discovery under 28 U.S.C. § 1782 to be a suit governed by the Federal Rules of Civil Procedure); *Glen 6 Assocs., Inc. v. Dedaj*, 770 F. Supp. 225, 228 (S.D.N.Y. 1991) (refusing to permit summary proceeding in landlord/tenant dispute where "[n]o authorization for summary adjudication . . . is provided in the federal rules of procedure nor in any other statute governing procedure in the district court").

Because Title III does not create a special statutory proceeding, this Court should deny the motion.

### 3.  Use of special proceedings is not warranted because the Federal Rules do not conflict with Title III's purpose.

The DOJ argues that the CRA allows it to jettison the Federal Rules whole cloth. *See Memorandum in Support of the DOJ's Motion to Compel*, Docket No. 2-2 at 11. However, that conclusion misapprehends the interplay between the Federal Rules and other statutes. The Federal Rules "govern the procedure in *all civil actions and proceedings* in the United States district courts." Fed. R. Civ. P. 1 (emphasis added). The Federal Rules allow all parties to make discovery requests, Fed. R. Civ. P. 26(b), move the court for relief, Fed. R. Civ. P. 7(b), and present any triable issue to a jury, Fed. R. Civ. P. 38. By strong default, all Federal Rules apply in each and every proceeding before the Court. It is only "where a strict application of the rules would frustrate the statutory purpose" that the Federal Rules "may be applied less rigidly." *Booth*, 902 F.2d at 931. In other words, the CRA, and the purpose it serves, direct the cadence of litigation within the framework of the full Federal Rules.

Here, Congress did not set forth a summary mechanism for adjudicating a records demand. The statute does not, in fact, identify *any* procedures for a district court to follow beyond Title III's reference to "appropriate process." Without an indication that any Federal Rules should not followed, or express identification of an alternate course of proceeding, the Federal Rules remain "generally applicable." *Daly v. United States*, 393 F.2d 873, 876 (8th Cir. 1968).

Even if this Court finds that a special proceeding is appropriate, Secretary Toulouse Oliver should, at a minimum, be allowed discovery, briefing, and an opportunity to present evidence to the Court, all of which are consistent with the purpose of the CRA. So long as the Federal Rules do not conflict with the purpose of a statute, they shall apply. *See, e.g.*, *Booth*, 902 F.2d at 931–32;

*Daly*, 393 F.2d at 876 ("[I]n the absence of specific procedures set forth [in statute], the Federal Rules of Civil Procedure are generally applicable."). As the DOJ has provided no basis for why following the default Federal Rules would frustrate the CRA's purpose, their call for use of special proceedings should be rejected.

Moreover, Title III states that the district court has jurisdiction to compel the production of records "by appropriate process." 52 U.S.C. § 20705. As in *Powell*, appropriate process here includes allowing the party opposing production to "challenge the summons on any appropriate ground," including allowing the party and court to probe whether the government sought to compel for "an improper purpose, such as to harass the [party] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. Without discovery, briefing, and presentation of evidence, there can be no adversarial testing of the government's demand for sensitive data, which Secretary Toulouse Oliver believes may have been motivated by an improper purpose. *See* Vigil Decl. ¶ 24; *see also S.E.C. v. Wencke*, 783 F.2d 829, 836–37 (9th Cir. 1986) (approving use of summary proceedings where "the parties . . . had notice concerning the nature of the proceedings, were permitted extensive discovery, . . . were permitted to file briefs and exhibits with the district court, and . . . except for dispensing with the filing of a complaint and answer, the district court applied the Federal Rules"). Because the Federal Rules governing discovery and the adversarial testing of evidence do not conflict with the CRA's purpose, those rules govern this proceeding.

**B. Regardless of applicable procedure, the DOJ's faulty request for records should be denied and this motion denied as moot.**

As more fully explained in the Secretary Toulouse Oliver's Motion to Dismiss, the DOJ's demand for records is not authorized by Title III. Before the DOJ can shift the burden to Secretary Toulouse Oliver, it must first demonstrate that it has made a valid demand for records. It has not.

Initially, the DOJ failed to comply with the Privacy Act of 1974 and the E-Government Act of 2002, which renders its demand for New Mexico's unredacted voter file invalid and any disclosure of records, compelled or voluntary, in contravention of those statutes unlawful. *See* Secretary Oliver's Motion to Dismiss at 18–26. Further, Title III, by its plain text, does not cover the records demanded by the DOJ. *See id.* at 12–18. Even if Title III did substantively support the DOJ's records demand, it has not stated the basis and purpose for the demand, as required by statute; and failed to identify a purpose for its demand that falls within the scope of Title III. *See id*. Because the DOJ's request is faulty, this case should be dismissed and the DOJ's motion to compel should be denied as moot.

**C. Even if the DOJ's request is not facially inadequate, the Court should allow the development of an adequate record to decide the Secretary Toulouse Oliver's affirmative defense of avoidance of illegality.**

The motion's demand for "all data fields" available in SERVIS, including sensitive voter data, is essentially a motion for summary judgment under Federal Rule 56(d) in that it asks the court to provide complete relief to the plaintiff and any grant of such relief would dispose of the action. Of note, Rule 56(d) allows a party opposing the motion to request and provide facts essential to opposing the motion. Here, Secretary Toulouse Oliver has reason to believe that the

DOJ's request would violate state and federal privacy laws, as she has made clear to the DOJ in correspondence predating this suit. *See* Exhibit C to Vigil Decl. Discovery is needed to investigate the DOJ's compliance with these laws and for Secretary Toulouse Oliver to probe the basis and purpose of the DOJ's demand.

Similarly, Secretary Toulouse Oliver has requested dismissal of the complaint based on the affirmative defense of avoidance of illegality. *See* Secretary Oliver's Motion to Dismiss at 18–26. Should dismissal be denied, we would seek discovery relevant to that argument. For instance, as set forth in the motion to dismiss, the Privacy Act of 1974 requires the DOJ, before establishing or revising a "system of records," to publish a detailed notice (a "SORN") in the Federal Register. 5 U.S.C. § 552a(e)(4). If the Court denies the motion to dismiss, including the argument about DOJ's failure to comply with the SORN requirement, the Secretary would request discovery into DOJ's compliance with the SORN requirement, including whether the notice describes the "location of the system;" "each routine use of the records contained in the system;" the "policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;" and "the agency official who is responsible for the system of records." *Id.* Similarly, the Secretary would seek discovery concerning DOJ's compliance with the E-Government Act, 44 U.S.C. § 3507, and its requirement that a privacy impact assessment have been completed.

Secretary Toulouse Oliver would also request information on the DOJ's purported "purpose and basis" for the data collection. When seeking voting records under the CRA, the DOJ must state both "the basis" and "the purpose" for that demand. 52 U.S.C. § 20703. The DOJ's efforts to obtain full voter lists from every state, as well DAG Gates' statements indicating that it intends to analyze the voter lists and provide states with feedback on specific registrations, suggest that the DOJ

intends to operate *its own* list maintenance program, rather than evaluate whether states' programs make the requisite "reasonable effort" to remove ineligible voters. *Id.* § 21083(a)(4)(A). News reports and statements indicating that the DOJ will be sharing voter lists with DHS to "enable DHS to prevent illegal aliens from corrupting our republic's democratic process," is in talks with DHS to use voter data "in criminal and immigration-related investigations," and is seeking to "establish a national voting database," *see infra* pp. 7–9, further cast doubt on the veracity and completeness of the DOJ's stated purpose.

The DOJ's demand under Title III is invalid if it has misstated the purpose of the demand. The statute's use of the definite article—"*the* purpose"—indicates that the DOJ must state its *actual* purpose, not simply a plausible one. 52 U.S.C. § 20703; *see Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 32 (1st Cir. 2022) (observing that use of the definite article particularizes the referenced subject and suggests reference to a single object). Further, it strains credulity to read Title III as authorizing the DOJ to demand election records for purposes beyond its statutory powers (*e.g.*, to create its own list maintenance system), or for purposes entirely unrelated to elections, such as criminal and immigration-related investigations. Secretary Toulouse Oliver cannot probe these important factual issues without the opportunity for discovery.

DOJ's pending motion deprives the Court of such a record and seeks to dispose of this case without any meaningful judicial review, all without any basis in law or even attempted factual justification. To ensure fundamental fairness and prevent the DOJ from short circuiting this litigation via inappropriate procedural tools, this Court should allow Secretary Toulouse Oliver to seek discovery into the DOJ's compliance with privacy laws and the purpose and basis for the DOJ's request.

## IV.    Conclusion

For the reasons above, the Court should issue an order denying DOJ's Motion to Compel or, in the alternative, defer ruling on DOJ's Motion until the Court has ruled on the pending Motion to Dismiss and the parties have had an opportunity to develop a factual record.

Dated: January 13, 2026                    Respectfully Submitted,

**RAÚL TORREZ**
**ATTORNEY GENERAL**
**NEW MEXICO DEPARTMENT OF**
**JUSTICE**

*/s/ James Grayson*
James Grayson
Chief Deputy Attorney General
Anjana Samant
Deputy Counsel for Impact Litigation
Olivia den Dulk
Bailey Quinn Colfax
Assistant Attorneys General
408 Galisteo Street
Santa Fe, NM 87501
Tel. (505) 490-4060
jgrayson@nmdoj.gov
asamant@nmdoj.gov
odendulk@nmdoj.gov
bcolfax@nmdoj.gov

*Counsel for Defendant Secretary*
*Maggie Toulouse Oliver*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2026, the foregoing pleading was filed with the Clerk

of the Court, using the CM/ECF system, causing all parties to be electronically served.


*/s/ James Grayson*
James Grayson


 */s/ Anjana Samant*
Anjana Samant