IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>MAGGIE TOULOUSE OLIVER, in her official capacity as Secretary of State of New Mexico,<br><br>      Defendant. | Case No. 1:25-cv-01193-LF-JFR<br><br><br>CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |

## **CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS**

Plaintiff United States of America respectfully submits this Opposition to the following motions: (1) the Motion to Dismiss by Intervenor New Mexico Alliance for Retired Americans ("Alliance") (Doc. 32); (2) the Motion to Dismiss by Intervenor Defendants Common Cause, Claudia Medina, and Justin Allen ("Common Cause.") (Doc. 34); and (3) the Motion to Dismiss by Secretary of State Toulouse Oliver ("Secretary of State") (Doc. 35). Collectively, the moving Defendant and Intervenors are referred to as "Movants." The United States submits this consolidated opposition to facilitate the Court's review of the duplicative and overlapping arguments made by the Movants. *See* L.R. 7.1(c).

## **INTRODUCTION**

The Attorney General of the United States brought this case as part of her investigation of New Mexico's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States engaged in correspondence with Defendant, requesting her cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Defendant refused to produce records

as mandated by federal law and necessary to evaluate their compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including New Mexico's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the defendants relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[1] The United States will focus most of its response on its CRA claim to compel production of federal election records it requires to complete its investigation of Defendant's list maintenance practices under HAVA and the NVRA.[2]

As explained below, a motion to dismiss is not appropriate for the CRA claim. The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written

---

[1] Case law addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, no other appellate courts have revisited the issue. A district court in California has granted an order to dismiss a request for records in California, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. January 15, 2026). As explained below, the California district court failed to follow the correct summary procedure for an Order to Show Cause under the CRA.

[2] The HAVA and NVRA claims likewise authorize the Attorney General to obtain federal election records. The record production requirements of those statutes are subject to litigation procedures inapplicable to Title III of the CRA.

demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. As discussed below in detail, the record before the Court demonstrates that the United States has established each of these requirements. In contrast, Movants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for their respective motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States is entitled to an order compelling production of New Mexico's SVRL and other responsive federal election records, and the motions to dismiss should be denied.

## **BACKGROUND**

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections

> Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States.

*Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

Acting pursuant to its authority to enforce these federal election statutes, on September 8, 2025, the United States sent a letter to Secretary Toulouse Oliver, seeking information regarding New Mexico's compliance with HAVA's list maintenance requirements ("September 8 Letter"). Ex. 1 to Decl. of Maureen Riordan ("Riordan Decl[3]."). The September Letter specifically requested an electronic copy of New Mexico's current SVRL used for federal elections, including both active and inactive voters. On September 23, 2025, New Mexico sent a letter refusing the Attorney General's demand. *See* Ex. 2 to Neff Decl.

The September 8 Letter explained that the SVRL to be produced "should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number" ("SSN4") as required by HAVA. *Id.* at 1 (emphasis in original). The September 8 Letter further elaborated on the statutory authority requiring production of the federal election records. It stated, "[w]e have requested New Mexico's [SVRL] to assess your state's compliance with the statewide VRL maintenance provisions" of the NVRA, as provided by the Attorney General's enforcement authority under Section 11 of the NVRA. *Id.* It also identified Section 401 of HAVA, which makes the Attorney General solely responsible for enforcing HAVA. *Id.* at 2. The September 8 Letter included a written demand for federal election records under Section 303 of the CRA:

> Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of New Mexico's complete and current [SVRL]. The purpose of the request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA.

---

[3] The Declaration of Maureen Riordan filed inadvertently omitted her signature. Riordan is no longer with the Department of Justice. The United States files contemporaneously herewith an updated Declaration of Eric Neff to resolve this omission (Ex. 1, "Neff Declaration"). The September 8 letter is now attached as Ex. 1 to the Neff Declaration.

*Id.* The letter described the applicable privacy protections that would be followed, including Section 304 of the CRA and the Privacy Act. *Id.* The letter concluded with information about how New Mexico could send the requested federal election records securely. *Id*.

On December 12, 2025, the United States filed the instant action seeking to compel production of the federal election records that it demanded, including New Mexico's SVRL with the HAVA identifying numbers. *See* Compl., Doc. 1. The Complaint included one count requiring production under the CRA. *Id.* at 7. As discussed below, the United States believes its CRA claim is dispositive of all the relief that it seeks through Title III's "severely limited inquiry" in a "summary proceeding."[4] *Lynd*, 306 F.2d at 226.

The elements of a demand for production of federal election records under the CRA are few and well-defined. First, the Attorney General must have made a written demand for federal election records stating the basis and purpose. 52 U.S.C. § 20703. Second, the demand must have been made to an officer of election, as that term is defined in Section 306 of the Act.[5] 52 U.S.C.

---

[4] As provided by Local Rule 7.1(c), the United States has filed a cross-motion to compel production of the federal election records under the CRA. The issues in the cross-motion are the same as those in Movants' respective motions, making it more efficient for the Court to review them together.

[5] Section 306 provides:

> As used in this chapter, the term ''officer of election'' means any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting in any general, special, or primary election at which votes are cast for candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico.

52 U.S.C. § 20706.

§§ 20703, 20706. Third, the officer of election must have failed or refused to make the demanded federal election records "available for inspection, reproduction, and copying." *Lynd*, 306 F.2d at 225-26; *see* 52 U.S.C. § 20703. Fourth, the Attorney General must have provided "a simple statement" to the Court where a production order is sought showing that these elements were satisfied. *Lynd*, 306 F.2d at 225-26. As discussed in Part II, the record demonstrates that the United States has met these requirements and is entitled to an order of production under Section 305 of the CRA.

In response, Movants make several overlapping and duplicative arguments, all of which lack merit. They misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the motion to dismiss standard to it. They incorrectly maintain that Title III of the CRA applies to investigation of only a narrow category of federal election laws. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records.[6] For the reasons discussed below, Movants' respective motions should be denied and the United States' demand for production of New Mexico's federal election records, including its SVRL, should be granted.

---

[6] A "publicly available" record would never need to be "produced." The Attorney General would simply be able to access it in the same manner as any other member of the public. If that were the rule, CRA's provisions mandating production would essentially be rendered meaningless.

## LEGAL STANDARD

Each of the Movants contend that the Court should apply the motion to dismiss standard to the United States' CRA claim seeking an order to compel production of federal election records. *See* New Mexico Alliance for Retired Americans Mot., Doc. 32; Common Cause, Claudia Medina, and Justin Allen's Mot., Doc. 34; and Secretary of State Toulouse Oliver's Mot., Doc. 35. Illustrative of their approach, the Movants argue that the Court must apply the *Iqbal* and *Twombly* standards and find that to secure relief under the CRA, the United States must allege in its Complaint a claim—presumably, a substantive violation of HAVA or the NVRA—and all known facts that support it. *See* Secretary of State's Mot., 35 at 14. They are mistaken. Movants repeat what the Fifth Circuit has described as "a basic misconception… concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is… purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for

the effective fulfillment of that obligation" through Title III of the CRA.[7] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34… is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA

---

[7] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

**ARGUMENT**

**A.     MOVANTS CANNOT CHALLENGE THE ATTORNEY GENERAL's BASIS AND PURPOSE TO INVESTIGATE THE STATE'S HAVA and NVRA COMPLIANCE**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records.  As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records.  52 U.S.C. § 20701.  Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.  After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper."  52 U.S.C. § 20705.

In the September 8 Letter, the Attorney General made a written demand under Section 303 of the CRA for New Mexico's federal election records, including its SVRL.  The letter specifically cited Section 303 of the CRA, stating that "[p]ursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of New Mexico's complete and current [SVRL].  The purpose of the request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA."  Ex. 1 to Neff Decl.

Nevertheless, the Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records.  Secretary of State's

Mot., 35 at 22; Common Cause's Mot., Doc. 34 at; and Alliance's Mot., Doc. 32 at 2. To the extent that Movants assert the demand needs to include facts showing an *extant* violation of federal law, that argument fails as a matter of law. *See supra-Section III Legal Standard* (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a violation of federal law be included in that demand).

Federal courts have rejected contentions that parallel those made by Movants. Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"). Movants' invocation of *Lynd* fails because Plaintiffs did not rely on a generalized or abstract purpose. The federal statute itself supplies the basis for the request. HAVA requires states to obtain and maintain a registrant's driver's license number or, if none exists, the last four digits of the registrant's Social Security number. 52 U.S.C. § 21083(a)(5)(A). Plaintiffs' September letter specifically identified that requirement and explained that the requested records are necessary to assess New Mexico's compliance with it. That New Mexico-specific statutory obligation distinguishes this case from *Lynd* and defeats Defendant's claim that the request consists of mere boilerplate. The United States plainly satisfied that requirement by stating, "[t]he purpose of the request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA." Ex. 1 to Neff Decl.

Contrary to what Movants argue, they are prohibited from using "any procedural device or maneuver," including their motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228. Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts. Therefore, their motions should be denied.

## B. THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS

Movants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of New Mexico's federal election records. *See* Secretary of State's Mot., Doc. 35 at 27-35; Alliance's Mot., Doc. 32 at 19-22; and Common Cause's Mot., Doc. 34. They are mistaken. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA. The requirement for a Privacy Impact Assessment

under E-Government Act does not apply to the investigation of New Mexico's list maintenance practices being conducted by the United States under HAVA and the NVRA. Similarly, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

### 1. The United States is complying with the Privacy Act.

Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. But Movants go even further, contending that the Complaint must be dismissed because the United States "has not complied with the stringent procedural mandates of the Privacy Act." Secretary of State's Mot., Doc. 35 at 32. Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information.[8] Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the Department is collecting is maintained according to the Privacy Act protections explained in the Civil Rights Division's Privacy Policy, which it has published online.[9] The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of

---

[8] Indeed, governmental compliance with relevant laws is, absent a showing to the contrary, presumed. *See, e.g.*, *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345, 1350 (Fed. Cir. 2005) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

[9] *See* U.S. Dep't of Just., Civ. Rts. Div., Privacy Policy ("Privacy Policy"), *available at* https://civilrights.justice.gov/privacy-policy (last visited Jan. 6, 2026).

records notices ("SORN"), most of which are identified with their citations in U.S. Department of Justice, Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148-24,151.[10]

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960. *See* Privacy Policy, *supra* n.16. The United States made its requests pursuant to those statutes. *See* Exs. 1, 2 to Neff Decl. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what some of the Movants contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not "to build a nationwide voter database…." Secretary of State's Mot., Doc. 35 at 16. Rather, the records being sought from New Mexico are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes that is unprecedented in its scale.

Similarly, to the extent that Movants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.[11]

---

[10] Additional SORNs issued by the Civil Rights Division to supplement the Department-wide privacy practices are titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); and 70 Fed. Reg. 43904-01 (July 29, 2005).

[11] *See* JUSTICE/DOJ-014, Department of Justice Employee Directory Systems, last published in full at 74 Fed. Reg. 57194 (Nov. 4, 2009), and modified at 82 Fed. Reg. 24151, 24153 (May 25, 2017); JUSTICE/DOJ-002, Department of Justice Computer Systems Activity and Access

Moreover, the Privacy Act does not bar the disclosure of New Mexico's SVRL to the United States, as Movants contend. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Defendant to refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

## 2. The First Amendment does not prohibit access to data the United States needs for its HAVA and NVRA claims.

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting New Mexico's SVRL. Movants Secretary of State contends that "the Privacy Act of 1974 bars the DOJ from gathering, let alone using, information about an individual's exercise of First Amendment rights." Secretary of State's Mot., Doc. 35 at 28; *see also* Common Cause's Mot., Doc. 34 at 14. But they miss the mark. The decisions they cite merely stand for the propositions noted; namely, that voting and registration implicate speech and actions protected under the First Amendment. They do not foreclose the United States from enforcing federal election laws like HAVA and the NVRA. Indeed, application of the Movants' argument would effectively prevent

---

Records, last published in full at 64 Fed. Reg. 73585-02 (Dec. 30, 1999), and modified at 66 Fed. Reg. 8425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24147-01 (May 25, 2017).

the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

### 3. The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.

Movants also argue that the demand for production of New Mexico's SVRL and other federal election records violates the E-Government Act. According to Defendant Movants, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* Secretary of State's Mot., Doc. 35 at 34. Again, neither the E-Government Act nor interpretative case law support the Defendant Movants' assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The data request is made to Defendants to provide a SVRL that they already maintain pursuant to federal law to analyze their federally required list maintenance. The SVRL would be kept on a system for which a Privacy

Impact Assessment has been done.[12]  Only when a new system is established—not when each new data request is made—will a PIA be required.[13]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act (UOCAVA). Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208 (a).

Even if the Court found the E-Government Act applied here—and it should not—Movants have misplaced their reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* Secretary of State's Mot., Doc. 35 at 34. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In that case, the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir.

---

[12]  An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. See Ex. 2 of Neff Decl. ("IPA Determination").

[13] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Impact Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Jan. 6, 2026).

2017) ("*EPIC II*"). In doing so, the *EPIC II* court explained that the Act "is intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Id*. at 378 (emphasis in original).

To the extent that Common Cause asserts that the Driver's Privacy Protection Act prohibits disclosure of information, the argument fails. The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

## C. THE UNITED STATES IS ENTITLED TO UNREDACTED "REPRODUCTON" AND "COPYING" OF NEW MEXICO'S FEDERAL ELECTION RECORDS, INCLUDING ITS SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers… relating to any… act requisite to voting'…." *Id.* Nevertheless, the Movants ask the Court to legislate limitations conspicuously absent from Title III. Common Cause argues that "unredacted electronic voter file exceeds its statutory

authority under the CRA" Common Cause's Mot., Doc. 34 at 9. However, Section 303 provides, "[a]ny record or paper required by [Section 301] to be retained and preserved shall, upon demand in writing by the Attorney General… be made available for inspection, *reproduction, and copying* at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* New Mexico's SVRL is required by HAVA to be in electronic form. It is axiomatic that providing the United States with an electronic copy of its SVRL will be much less burdensome than physical copying of every individual registration record.

Movants ignore the plain language of Section 304 of the CRA, which prohibits the United States from "disclos[ing] any record or paper produced" pursuant to Title III, including "any reproduction or copy," except for narrow purposes including "the presentation of any case or proceeding before any court or grand jury." 52 U.S.C. § 20704. If the United States was only entitled to unredacted information, then Section 304 would have no purpose. Section 304 obviously contemplates that the United States will have sensitive information, which is why it limits the disclosure of that information. The United States specifically referenced this restriction in its September 8 Letter, along with other federal protections including the Privacy Act that limit use, dissemination, and disclosure of records produced to the Attorney General. *See* Ex. 1 to Neff Decl. It goes without saying that the United States will strictly abide by these statutory limitations. The unredacted SVRL and other responsive federal election records can certainly be produced to

the United States consistent with these federal privacy protections through a protective order stating those protections.[14]  *Lynd*, 306 F.2d at 230.

Finally, if the Movants' position were to be adopted, it would eviscerate Title III.  The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law.  For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number.  *See* 52 U.S.C. § 21083(a)(5)(A).  That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[15]  There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute."  *Coleman II*, 313 F.2d at 868.

The data the United States has requested under the CRA is the same that twenty-five states (including New Mexico) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-

---

[14]  Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States has offered all states a memorandum of understanding, or MOU, memorializing these requirements.  *See* Neff Decl.  As of January 6, five states have provided their SVRLs without any MOU.  Two states – Texas and Alaska – have agreed to provide their SVRL under the terms of the MOU.  Seven other states have indicated their intention to provide the SVRLs in the near future.  *Id.* ¶ 19.

[15]  *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

maintenance requirements.[16]  Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights.  *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal docketed*, No. 25-1585 (1st Cir. June 17, 2025).

Consequently, the United States is entitled to reproduction and copying of New Mexico's unredacted SVRL under the unambiguous language of Section 303 of the CRA.  *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying"); *Lynd*, 306 F.2d at 231 (same).  Finally, the United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[17]

---

[16] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Jan. 6, 2026).

[17] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006).  The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Jan. 6, 2026). For the Court's convenience, the three documents are provided as Exhibits 2-4 (attached to this Memorandum in Opp. To Motions to Dismiss).

## CONCLUSION

For the foregoing reasons, the Court should deny all three motions to dismiss (Docs. 32, 34, and 35.

DATED: January 27, 2026.                          Respectfully submitted,

                                                  HARMEET K. DHILLON
                                                  Assistant Attorney General
                                                  Civil Rights Division

RYAN ELLISON                                      ERIC V. NEFF
First Assistant United States Attorney            Acting Chief, Voting Section
District of New Mexico                            Civil Rights Division


                                                   /s/ *Brittany E. Bennett*
                                                  TIMOTHY F. MELLETT
                                                  BRITTANY E. BENNETT
                                                  CHRISTOPHER J. GARDNER
                                                  Attorneys, Voting Section
                                                  Civil Rights Division
                                                  U.S. Department of Justice
                                                  4 Constitution Square
                                                  150 M Street NE
                                                  Washington, D.C. 20530
                                                  Telephone: (202) 704-5430
                                                  Email: Brittany.Bennett@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett