## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

———————————

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                                          Case No.: 1:25-cv-01193-JCH-JFR

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State of
New Mexico,

     Defendant,

and

NEW MEXICO ALLIANCE FOR RETIRED
AMERICANS,

     Intervenor-Defendant,

and

COMMON CAUSE, CLAUDIA MEDINA,
and JUSTIN ALLEN,

     Intervenor-Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on Defendant Maggie Toulouse Oliver's Motion to Dismiss

Pursuant to Federal Rule 12(b)(6) and Memorandum of Law in Support, Doc. 35; Intervenor-

Defendant New Mexico Alliance for Retired Americans' Motion to Dismiss, Doc. 32; and

Intervenor-Defendants Common Cause, Claudia Medina, and Justin Allen's Motion to Dismiss,

Doc. 34. Defendants filed these motions to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure in opposition to the United States Department of Justice, Civil Rights Division's

("DOJ") complaint, Doc. 1 ("Complaint"), and its Motion to Compel Production of Records Demanded Pursuant to 52 U.S.C. § 20705, Doc. 2 ("Motion to Compel).

Having carefully reviewed the parties' briefs and supplemental authorities, the applicable law, arguments at the April 21, 2026, motion hearing, and being otherwise fully informed, the Court concludes the DOJ has not satisfied the requirements of 52 U.S.C. § 20703 of Title III of the Civil Rights Act of 1960. Accordingly, the Court will **GRANT** each motion to dismiss, Docs. 32, 34, 35 (collectively "Motions to Dismiss"); **DENY AS MOOT** the DOJ's Motion to Compel, Doc. 2; and will **DISMISS** the DOJ's Complaint, Doc. 1, **WITH PREJUDICE** for the reasons explained below.

## FACTUAL BACKGROUND

I.    **New Mexico's Voting Registration List ("VRL")**

Since 2019, New Mexico's voter data has been electronically stored in a secure database known as the State Elections, Registration & Voting Integrity Systems ("SERVIS"). NMSA 1978, § 1-5-30 (2019) (establishing electronic voter registration management system). SERVIS stores voters' personally identifiable information ("PII") after voters voluntarily submit their completed voter registration applications. *Id.*; *see also* NMSA 1978, § 1-4-47 (2023) (outlining automatic voter registration processes). That PII includes, inter alia, the voter's name, gender, physical address, mailing address, phone number, current party affiliation, date of birth, date of registration, and voting history for all state and local elections. NMSA 1978, § 1-4-5.4(B) (2019) (describing content of voter registration forms); § 1-4-47(B); NMAC § 1.10.35.8(A)(4). Pursuant to data sharing restrictions created by state law, the Secretary of State "shall furnish voter data" after the requestor satisfies certain requirements. *See* NMSA 1978, § 1-4-5.5(A), (B) (2015).

As the Secretary of State, Toulouse Oliver is the chief election official of New Mexico. Doc. 1 at 3 ¶ 8. In that role, she is responsible for managing SERVIS and the information contained therein, as well as coordinating New Mexico's adherence to the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501-20511, and the Help America Vote Act ("HAVA"), 52 U.S.C. §§ 20901-21145. *See* § 1-5-30(A); NMSA 1978, § 1-5-3 (2005) (establishing voter record system regarding HAVA); *see also* 52 U.S.C. §§ 20509, 20701.

## II.    The DOJ's Demand Letter

On September 8, 2025, the DOJ sent Toulouse Oliver a letter requesting a copy of New Mexico's VRL.[1] Doc. 2-3 at 2. ("Demand Letter"); *see also* Doc. 1 at 5 ¶¶ 19-20. To fully comply with the demand, the DOJ specifically requested, "The electronic copy of the statewide VRL should contain *all fields*[.]" Doc. 2-3 at 2. Meaning, the DOJ expected Toulouse Oliver to turn over an electronic copy of New Mexico's VRL including each voter's "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number. . . ." *Id.* The DOJ asserted this request was made pursuant to its authority under the NVRA, HAVA, and Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. §§ 20701-20706.[2] *See* Doc. 2-3 at 2, 3; *see also* Doc. 1 at 3 ¶ 9 (citing the NVRA and HAVA). The

---

[1] This was apparently the second letter the DOJ sent Toulouse Oliver. *See* Doc. 35 at 18. The first was a letter dated August 14, 2025, and included the same demand for New Mexico's VRL. *Id.*; Doc. 107 at 8:3-4. It also stated the DOJ "had already 'received New Mexico's statewide voter registration list[.]'" Doc. 35 at 18. In her response, Toulouse Oliver purportedly noted she had not shared the VRL with the DOJ. *See id.* These letters were not provided to the Court.

[2] The DOJ's recitation of Section 20703 in the Demand Letter is incomplete. *See* Doc. 2-3 at 3. It conspicuously omits the ultimate sentence, stating, "This demand shall contain a statement of the basis and the purpose therefor." *Compare* Doc. 2-3 at 3 *with* 52 U.S.C. § 20703.

Demand Letter also provided, "The purpose of this request is to ascertain New Mexico's compliance with the list maintenance requirements of the NVRA and HAVA."[3] Doc. 2-3 at 3.

Toulouse Oliver responded two weeks later.[4] *See* Doc. 2-4. She stated she would "provide in-person or electronic access to a redacted voter file" and noted the DOJ "made no attempt to explain why [its] evaluation would require the inspection of unredacted private voter information that is otherwise protected by New Mexico law" and the Privacy Act of 1974, 5 U.S.C. § 552a.

---

[3] Defendants and amici curiae have thoroughly alerted the Court of the DOJ's potential ulterior motives in seeking voters' PII. *See* Doc. 32 at 5-6; Doc. 34 at 8, 8 n.7; Doc. 35 at 16-18; Doc. 89 at 10-14; Doc. 92 at 2-4. These are exemplified by the Executive Orders issued by the current Executive branch and agencies like the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") that have shared and reviewed protected voter data. *See, e.g.*, Exec. Order No. 14248, 90 Fed. Reg. 59 (Mar. 28, 2025) (titled "Preserving and Protecting the Integrity of American Elections" and directing DHS to "review each State's *publicly available* voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507 [of the CRA], alongside Federal immigration databases and State records requested, . . . for consistency with Federal requirements." (emphasis added)); Exec. Order No. 14399, 91 Fed. Reg. 59 (Apr. 3, 2026) (titled "Ensuring Citizenship Verification and Integrity in Federal Elections" and directing DHS to compile a "State Citizenship List" in order to "assist in verifying identity and Federal election voter eligibility"). Other districts have also noted these events. *See Weber*, 816 F. Supp. 3d at 1184 ("It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database."); *Schmidt*, 2026 WL 1850016, at *2 ("The quiet parts do not help. Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hope to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement.").

The Court has not considered these arguments, associated documents, or events while ruling on the Motions to Dismiss, however. *See* Fed. R. Civ. P. 12(d) (noting a court cannot consider "matters outside the pleadings"); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (outlining limited exceptions to considering documents outside the pleadings and those subject to judicial notice); *accord Bellows*, 2026 WL 1430481, at *3 n.6 ("Fortunately for the United States, this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true.").

[4] The Complaint alleges this letter was sent a day prior on September 23, 2025. Doc. 1 at 7 ¶¶ 25, 26. Yet, the copy of the letter the DOJ filed is dated September 22, 2025. Doc. 2-4 at 2.

Doc. 2-4 at 2, 3. Toulouse Oliver also emphasized New Mexico's full compliance with the CRA, the NVRA, and HAVA. *Id.* at 2.

Two months later, the DOJ sued Toulouse Oliver on a single count under the CRA. *See* Doc. 1 at 7-8. The Complaint alleges the DOJ sent the Demand Letter "[b]ased on a review of the 2024 [Election Administration Voting Survey] Report[5] . . . seeking information regarding New Mexico's compliance with federal election law." *Id.* at 5 ¶ 18 (footnote added). The DOJ contemporaneously filed its Motion to Compel seeking production of the same documents and information. Doc. 2.

Soon thereafter, the Court granted Intervenor-Defendants Common Cause, Claudia Medina, and Justin Allen (collectively "Common Cause") and New Mexico Alliance for Retired Americans' ("NM Alliance") unopposed motions to intervene as defendants. Docs. 7, 9, 21, 25. The Court also granted three amici curiae leave to file their respective amicus briefs. *See* Docs. 87, 88, 91; *see also* Doc. 89 (amicus brief of Seventeen States and the District of Columbia[6]); Doc. 90 (amicus brief of Bipartisan Former State Secretaries of State Nationwide); Doc. 92 (amicus brief of the Democratic National Committee). Each Defendant then filed their respective motion to dismiss, arguing the CRA fails to provide a legal basis for the DOJ's suit. *See* Doc. 32 at 7-14; Doc. 34 at 9-15; Doc. 35 at 21-27.

---

[5] HAVA established the United States Election Assistance Commission ("EAC") in 2002. EAC, *About the EAC*, http://eac.gov/about (last visited July 8, 2026). It is "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process." *Id.* The EAC conducts the biennial Election Administration Voting Survey ("EAVS") and produces a report. *See Election Administration and Voting Survey 2024 Comprehensive Report*, U.S. Election Assistance Comm'n (June 2025), https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf.

[6] The states include Maryland, Minnesota, Arizona, California, Colorado, Delaware, District of Columbia, Hawai'i, Illinois, Maine, Michigan, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.

The Court held a hearing on the parties' Motions to Dismiss on April 21, 2026. *See* Doc. 103 (Clerk's Minutes); Doc. 107 (Transcript). After hearing each party's argument,[7] the Court took the matter under advisement. Doc. 103 at 1.

### III.   Contemporaneous Demand Letters and Nationwide Litigation

The DOJ has made the same demand for statewide VRLs of forty-eight states and the District of Columbia ("D.C.").[8] After thirty states and D.C. did not comply with the DOJ's request, the DOJ sued each state to compel production of their VRLs.[9] To date, twelve of these cases have

---

[7] The DOJ offered a multitude of facts and legal contentions not in its briefing. This included substantiating "the basis" for the DOJ's demand by pointing to (1) congressional intent that "the DOJ be able to conduct an independent review of each state's list," Doc. 107 at 42:4-13 (referring to Doc. 2-3 at 2 n.1); (2) EAVS Report data about New Mexico's duplicate registrations and the percentage of removed-voters, *id.* at 44:17-24; and (3) a "facial violation" concerning New Mexico's HAVA identifiers. *Id.* at 45:4, 4-7. These new facts and arguments fall outside the content the Court considers when ruling on a motion to dismiss. *See Tellabs, Inc.*, 551 U.S. at 322.

[8] The status of each of these cases is evolving. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (July 8, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information (last viewed July 8, 2026); *see also Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. Off. of Pub. Affs. (Feb. 26, 2026), https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls (last viewed July 13, 2026).

[9] In fifteen of those cases, the DOJ asserts a single claim under the CRA that is nearly identical to the one filed here. *See, e.g.*, Complaint, *United States v. DeMarinis*, No. 1:25-cv-03934, ECF No. 1 at 7-8 (D. Md. Dec. 1, 2025); Complaint, *United States v. Copeland Hanzas*, No. 2:25-cv-00903, ECF No. 1 at 7-8 (D. Vt. Dec. 1, 2025); Complaint, *United States v. Albence*, No. 1:25-cv-01453, ECF No. 1 at 10-11 (D. Del. Dec. 2, 2025); Complaint, *United States v. Amore*, No. 1:25-CV-00639, ECF No. 1 at 7-8 (D. R.I. Dec. 2, 2025); Complaint, *United States v. Hobbs*, No. 3:25-cv-06078, ECF No. 1 at 7-8 (W.D. Wash. Dec. 2, 2025); Complaint, *United States v. Griswold*, No. 1:25-cv-03967, ECF No. 1 at 6-7 (D. Colo. Dec. 11, 2025); *United States v. Nago*, No. 1:25-cv-00522, ECF No. 1 at 8-9 (D. Haw. Dec. 11, 2025); Complaint, *United States v. Galvin*, No. 1:25-cv-13816, ECF No. 1 at 7-8 (D. Mass. Dec. 11, 2025); Complaint, *United States v. Aguilar*, No. 3:25-cv-00728, ECF No. 1 at 8 (D. Nev. Dec. 11, 2025); Complaint, *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036, ECF No. 1 at 8-9 (W.D. Wis. Dec. 18, 2026); Complaint, *United States v. Raffensperger*, No. 25-cv-00548, ECF No. 1 at 8-9 (M.D. Ga. Dec. 18, 2025) (subsequently dismissed without prejudice for lack of subject matter jurisdiction); Complaint, *United States v. Matthews*, No. 3:25-cv-03398, ECF No. 4 at 8-9 (C.D. Ill. Dec. 19, 2025); Errata Corrected Complaint, *United States v. D.C. Bd. of Elections*, No. 1:25-cv-04403, ECF No. 3-1 at

been dismissed. *See United States v. Weber*, 816 F. Supp. 3d 1168, 1196 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, 819 F. Supp. 3d 753, 770 (W.D. Mich. Feb. 10), *aff'd* No. 26-1225, 2026 WL 1815425, at *1, 8 (6th Cir. June 24, 2026); *United States v. Galvin*, Civil No. 25-13816, 2026 WL 972129, at *6 (D. Mass. Apr. 9, 2026), *appeal docketed* No. 26-1657 (1st Cir. June 9, 2026); *United States v. Amore*, C.A. No. 25-cv-00639, 2026 WL 1040637, at *6 (D.R.I. Apr. 17, 2026), *appeal docketed* No. 26-1665 (1st Cir. June 9, 2026); *United States v. Fontes*, No. CV-26-00066, 2026 WL 1177244, at *7 (D. Ariz. Apr. 28, 2026); *United States v. Bellows*, No. 1:25-cv-00468, 2026 WL 1430481, at *10 (D. Me. May 21, 2026); *United States v. Wis. Elections Comm'n*, 25-cv-1036, 2026 WL 1430354, at *5 (W.D. Wis. May 21, 2026); *United States v. DeMarinis*, Civil Case No. 25-cv-03934, 2026 WL 1780586, at *6 (D. Md. June 18, 2026), *appeal docketed* No. 26-1878 (4th Cir. July 13, 2026); *United States v. Schmidt*, No. 2:25-cv-01481, 2026 WL 1850016, at *1, 3 (W.D. Pa. June 27, 2026); *United States v. Scanlan*, Case No. 25-cv-371, 2026 WL 1864054, at *8, 10 (D.N.H. June 29, 2026), *appeal docketed* No. 26-1783 (1st Cir. July 7, 2026); *United States v. Bd. of Elections of the State of N.Y.*, 1:25-CV-1338, 2026 WL 1999921, at *1 (N.D.N.Y. July 10, 2026).

## LEGAL BACKGROUND

As outlined in the Elections Clause, the United States Constitution empowers all states to regulate and administer their elections: "The Times, Places and Manner of holding Elections for

---

7-8 (D.D.C. Dec. 19, 2025); Complaint, *United States v. Fontes*, No. 2:26-cv-00066, ECF No. at 7 (D. Ariz. Jan. 1, 2026); Complaint, *United States v. Thomas*, No. 3:26-cv-00021, ECF No. 1 at 7-8 (D. Conn. Jan. 6, 2026); Complaint, *United States v. Raffensperger*, No. 1:26-cv-00485, ECF No. 1 at 9 (N.D. Ga. Jan. 23, 2026).

Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations. . . ." U.S. Const. art. I, § 4, cl. 1. "The Framers recognized the difficulty of crafting election laws 'applicable to every probable change in the situation of the country.' So instead of constitutionalizing election law, they decided that a 'discretionary power over elections' needed to be lodged 'somewhere.'" *Watson v. Republican Nat'l Comm.*, No. 24-1260, 2026 WL 1855462, at *12 (U.S. June 29, 2026) (quoting The Federalist No. 59, at 362 (C. Rossiter ed. 1961)). In many ways, that power was granted to the states to carry the mantel of ensuring elections run smoothly by regulating voter registration, determining voter eligibility, and maintaining voter rolls. *See Foster v. Love*, 522 U.S. 67, 69 (1997); *United States v. Benson*, No. 26-1225, 2026 WL 1815425, at *1 (6th Cir. June 24, 2026) ("States do most of the heavy lifting in overseeing federal elections.").

States' control over elections is not completely unfettered, however. *See Foster*, 522 U.S. at 69. The Elections Clause also "empowers Congress to pre-empt state regulations governing the 'Times, Places and Manner' of holding" elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). Pertinent here, Congress enacted three federal statutes—the CRA, 52 U.S.C. §§ 20701-20706, the NVRA, 52 U.S.C. §§ 20501-20511, and HAVA, 52 U.S.C. §§ 20901-21145—that created specific, narrow roles for the federal government in election regulation. To better understand the DOJ's claim, the Court provides a short summary of each statute. The Court begins chronologically and turns first to the CRA, which predates the NVRA and HAVA by decades. While the DOJ did not file claims under the latter two statutes, both are still relevant to its suit.

## I.       Title III of the Civil Rights Act

Passed in 1963, Congress enacted the CRA to combat racially biased voter suppression and disenfranchisement rampant during the Jim Crow era. Congress emphasized the statute's purpose was "to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race," and was meant to buttress the Attorney General "during any investigation it may conduct on complaints of a denial to vote." H.R. Rep. No. 86-956 at 7 (1959).[10] To effectuate this goal, Congress charges state election officials with "retain[ing] and preserv[ing], for a period of twenty-two months from the date of any general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701. The CRA also grants the Attorney General investigative authority:

> Any record or paper required by [S]ection 20701 . . . to be retained and preserved shall, upon demand in writing by the Attorney General . . . directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. § 20703.

Should a dispute result from such a demand, the "United States district court for the district in which a demand is made pursuant to [S]ection 20703 . . ., or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. The DOJ relies on these provisions to support its demand and claim.

---

[10] There are no claims of racially biased voter suppression in this case.

## II.    The National Voter Registration Act

Thirty years after the CRA was passed, in 1993, Congress enacted the NVRA "against a backdrop of lackluster voter registration and political participation." *Fish v. Kobach*, 840 F.3d 710, 720 (10th Cir. 2016). To address these issues, the NVRA "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). *See* 52 U.S.C. § 20501(b)(1)-(4) (outlining the NVRA's four purposes). Further, the NVRA "aims at regulating uniform voting laws and procedures because 'discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.'" *Voter Ref. Found., LLC v. Torrez*, 160 F.4th 1068, 1079 (10th Cir. 2025) (quoting § 20501(a)(3)).

Amongst other requirements, the NVRA directs states to conduct a general program of voter list maintenance and to make certain records of their list-maintenance activities publicly available. *See* 52 U.S.C. §§ 20507(a), (i). Pursuant to certain boundaries, the NVRA also conserves the states' traditional authority for administering elections by giving states the flexibility and autonomy to design and operate a list-maintenance program within the statute's general parameters. § 20507(a)(4) (requiring "a reasonable effort to remove the names of ineligible voters"). If necessary, the Attorney General may pursue a civil enforcement action to investigate whether states are carrying out these statutory obligations. 52 U.S.C. § 20510(a).[11]

The Tenth Circuit recently interpreted the NVRA and whether it preempts pertinent New Mexico law controlling the publication of private voter data. *See Torrez*, 160 F.4th at 1072, 1081-

---

[11] No NVRA civil enforcement action has been filed here; and no documents have been demanded directed to records of list-maintenance activities.

84. Below, the district court ruled that the Voter Reference Foundation ("VRF")—an organization that obtained and published states' voter data on its public website—could continue to share each New Mexico "voter's name, birth year, registration address, registration date, party affiliation, registration status, precinct, and voting participation history." *Id.* at 1073, 1073-75. On appeal, the *Torrez* Court concluded, inter alia: (1) the NVRA preempts New Mexico privacy law restricting the use and sharing of voter data; and (2) the Secretary of State violated the NVRA's "enumerated purposes of public inspection and circulation of voter data" by "refusing to produce the requested voter data per" state law use-restrictions. *Id.* at 1083, 1088; *see id.* at 1081-84. The Tenth Circuit added an important caveat to these conclusions, however:

> To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation . . . The State may limit such sensitive information, but as we underscore, restricting uses and/or publication altogether is prohibited by the NVRA.

*Id.* at 1083 n.14 (citing §1-4-5.5(B)).[12] In other words, under Tenth Circuit precedent, the NVRA does not provide for unfettered public disclosure of voters' PII. Because *Torrez* concerns the NVRA rather than the CRA, *Torrez* is not dispositive in deciding the Motions to Dismiss but its conclusion is informative.[13]

---

[12] Other federal courts have concluded similarly. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) (noting that information subject to redaction can include personal information of those subject to criminal investigations, amongst other exceptions); *Bellows*, 2026 WL at 1430481, *9 ("[N]either [the NVRA or HAVA] give[] the United States the power to compel Maine to produce its current computerized SVRL 'with all fields.'"); *cf. Bd. of Elections*, 2026 WL 1999921, at *11 ([T] the Government's NVRA claim fails for a much simpler reason: [52 U.S.C.] § 20507(i) does not require the disclosure of voter registration lists at all.").

[13] Defendants argue *Torrez* "dooms [the] DOJ's claim" for the unredacted VRL because Toulouse Oliver may redact voters' PII before providing it to a third party. Doc. 32 at 17; *see* Doc. 34 at 17; Doc. 35 at 26; 160 F.4th at 1083 n.14. However, as noted, *Torrez* does not address the CRA.

### III.    The Help America Vote Act

In 2002, Congress codified HAVA. *See* Pub. L. No. 107-252, 116 Stat. 1666 (2002). In an effort to improve voting systems and voter access, HAVA requires states adopt "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A). Specifically, states must "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." § 21083(a)(1)(A). "[O]nly voters who are not registered or who are not eligible to vote are removed from the computerized list," as well as duplicate names. § 21083(a)(2)(B)(i), (iii). Thus, the SVRL serves as states' "single system for storing and managing the official list of registered voters." § 21083(a)(1)(A)(i). HAVA contains no disclosure requirements.

Within this statutory framework, the "specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." 52 U.S.C. § 21085. If the Attorney General believes these provisions are not being followed, then the Attorney General may "bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief." 52 U.S.C. § 21111.[14]

---

[14] No HAVA civil action has been brought here, nor has claim demanding the production of the State's VRL.

**LEGAL STANDARD**

I.    **"Appropriate Process" or Special Statutory Proceeding**

Section 20705 of the CRA grants federal district courts "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. The CRA does not define "appropriate process," however. To fill the gap, the DOJ asserts it is entitled to a "special statutory proceeding" after "filing an application for an order under Title III," because it "is not the commencement of an ordinary, traditional civil action" and instead is "merely a *pre-suit* investigation."[15] Doc. 51 at 9 (text only). Meaning, the Court's role in considering the merits of the DOJ's suit should be curtailed and the Federal Rules of Civil Procedure need not apply. *See id.*

---

[15] The DOJ's contentions about its motivations to sue are inapposite. In one regard, the Government posits New Mexico has committed a "facial violation" of the NVRA and HAVA, so it needed to bring an enforcement action. *See* Doc. 107 at 45:4; *see also id.* at 43:25-44:19 (explaining New Mexico's "abnormal" percentages and duplicate registrations documented in the EAVS report). At the same time, the DOJ frames the CRA as a "pre-suit investigative tool" that is part of its "trust but verify approach" concerning the State's VRL maintenance under the NVRA and HAVA. *Id.* at 34:20-21, 35:15, 40:24-25 (describing the suit as "an independent assessment consistent with this notion in the federal model of trust but verify"); *see also* Doc. 51 at 9 ("The CRA differs from ordinary civil actions because its 'chief purpose' is to facilitate *pre-suit* investigation."). The paradox of these contentions is obvious. Either the DOJ is suing to enforce New Mexico's statutory compliance or it is investigating a suspected violation of the NVRA and HAVA.

These arguments are not unique to this case. *See, e.g.*, *Bellows*, 2026 WL 1430481, at *9 ("Stated a bit more colloquially, the United States has filed a HAVA action in search of a HAVA violation, which is not the preferred order of things in the course of civil litigation."); *id.* at *10 ("[T]he United States' attorney characterized the federal government's role in the voter-registration scheme created by HAVA and the NVRA as 'one of trust but verify.' But the text and structure of those statutes require a greater degree of trust than this Department of Justice would perhaps like to give[.]" (text only)); *Benson*, 819 F. Supp. 3d at 759 ("There is simply no basis in the Federal Rules of Civil Procedure for the United States's suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery."); *Galvin*, 2026 WL 972129, at *6 ("The only support the United States marshals for its proposed interpretation are its twin contentions that Title III was enacted as an investigatory tool to identify violations of federal election law, and that the Attorney General cannot be required to prove a violation before seeking evidence of the same. These arguments miss the point." (text only)).

at 10-12. Common Cause opposes and argues the Federal Rules of Civil Procedure govern as usual. Doc. 34 at 21-22.

Every other district court that addressed this argument has applied the Federal Rules of Civil Procedure. *See Bellows*, 2026 WL 1430481, at *5 n.8 ("[N]o district court has adopted the United States' view[.]"); *Weber*, 816 F. Supp. 3d at 1180-81; *Oregon*, 2026 WL 318402, at *8; *Benson*, 819 F. Supp. 3d at 758-59; *Amore*, 2026 WL 1040637, at *3; *Fontes*, 2026 WL 1177244, at *1-2; *DeMarinis*, 2026 WL 1780586, at *2; *Scanlan*, 2026 WL 1864054, at *1, *1 n.2; *Bd. of Elections*, 2026 WL 1999921, at *6 ("[T]he Court joins the many other district courts which have determined that a court's role in evaluating these Title III claims is not so limited."). And many relied on *United States v. Powell*, 379 U.S. 48 (1964), to do so.[16] *See Weber*, 816 F. Supp. 3d at 1182, 1182 n.15; *Oregon*, 2026 WL 318402, at *8; *Fontes*, 2026 WL 1177244, at *1; *Bellows*, 2026 WL 1430481, at *5; *DeMarinis*, 2026 WL 1780586, at *2; *Bd. of Elections*, 2026 WL 1999921, at *6. To date, no district court has sided with the DOJ.

Here, the Court concludes that the "appropriate process" is guided by the Federal Rules of Civil Procedure. Nothing about the DOJ's suit indicates those Rules should be displaced. By submitting a traditional civil complaint and motion to compel—rather than an administrative subpoena, for instance—the DOJ voluntarily invoked the jurisdiction of the federal courts and began the usual litigation process. As Rule 1(a) of the Federal Rules of Civil Procedure squarely states, "These rules govern the procedure in *all* civil actions and proceedings in the United States

---

[16] There, the United States Supreme Court considered three provisions of the Internal Revenue Code that granted courts the general power to enforce the Internal Revenue Service's summonses with "jurisdiction by appropriate process to compel." *See* 26 U.S.C. §§ 7402(b), 7604(a), (b); *Powell*, 379 U.S. at 52. Because these statutes were silent as to the "applicable procedures to be followed in invoking the court's jurisdiction," the Supreme Court concluded the Federal Rules of Civil Procedure applied to adjudications under the statutes. *Powell*, 378 U.S. at 58 n.18.

district courts[.]" (emphasis added). Thus, this suit falls squarely within the gambit of the ordinary, civil litigation processes.[17] Accordingly, the viability of the DOJ's single claim will be analyzed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    Rule 12(b)(6) Motion to Dismiss Standards

The standards attendant to a Rule 12(b)(6) motion are well known. By bringing such a motion, Defendants assert that, even if the facts alleged by the DOJ are true, the Complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court also looks to Rule 8(a)(2) and how "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court will accept as true all factual allegations contained in the Complaint, *id.*, and it must construe the allegations in the light most favorable to the DOJ. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 558 (2007). Legal conclusions shrouded as factual allegations are not given the same presumption of truthfulness, however. *See Iqbal*, 556 U.S. at 678-79. When the allegations in a complaint cannot raise a plausible claim of "entitlement to relief," then the cause of action should be dismissed. *Twombly*, 550 U.S. at 558.

## DISCUSSION

The overarching issue in this case is simple: under the CRA, is the DOJ's written demand sufficient to compel production of New Mexico's complete and unredacted VRL? Defendants

---

[17] Were the Court to conclude otherwise, its analysis of the dispositive issue—whether the DOJ's written demand meets the requirements of Section 20703—would be the same. *See Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (noting that even in a summary proceeding, the court must decide as a matter of law whether the records can be properly demanded under Title III); *see also Wis. Elections Comm'n*, 2026 WL 1430354, at *2 ("The government disputes whether Rule 12(b)(6) applies in this case," but "analysis of the dispositive issue would be the same either way[.]"). Regardless, the DOJ provides no insight as to what constitutes "appropriate process" or whether a procedural exception would apply. *See, e.g.*, Fed. R. Civ. P. 1(a) (outlining that the federal rules apply "except as stated in Rule 81").

argue it is not because (1) the DOJ has failed to heed the requirements of Section 20703 of the CRA; (2) the DOJ's demand exceeds the scope of the CRA; and (3) the demand for unredacted voter information violates state and federal privacy law. *See generally* Docs. 32, 34, 35. Because Defendants' first argument resolves the Motions to Dismiss, the Court does not reach the remaining contentions.

The DOJ's authority to request election records under the CRA is a creature of statute. In this way, the Court looks to the plain language of Section 20703. *See Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, begins with the text."). When the language of a statute is clear and unambiguous—such as here—the Court need not read beyond the text. *See United States v. Husted*, 545 F.3d 1240, 1245 (10th Cir. 2008). "[A]fter all, there can be no greater statement of legislative intent than an unambiguous statute itself." *Id.*

Section 20703 provides that "[a]ny record or paper required[18] . . . to be retained and preserved" under Section 20701 "shall, upon demand in writing by the Attorney General . . . be made available for inspection, reproduction, and copying . . . This demand shall contain a statement of the basis and the purpose therefor." (footnote added).

Two Fifth Circuit cases—published soon after the CRA's codification—recognize Section 20703's requirements for crafting a successful demand. In *Kennedy v. Lynd*, the Fifth Circuit

---

[18] The Court need not decide whether New Mexico's VRL is a "record or paper" subject to the retention and demand provisions of Section 20701. While not raised here, the Court is aware this issue has been contested in multiple cases and was a reason for dismissal. *See DeMarinis*, 2026 WL 1780586, at *5 ("[T]his Court joins every court to have addressed this issue in concluding that an SVRL is not a record or paper that a state must produce to the United States under the CRA."); *Benson*, 2026 WL 1815425, at *6-7; *Fontes*, 2026 WL 1177244, at *5-7; *Bellows*, 2026 WL 1430481, at *7; *Wis. Elections Comm'n*, 2026 WL 1430354, at *4-5; *Scanlan*, 2026 WL 1864054, at *6; *Schmidt*, 2026 WL 1850016, at *2; *Bd. of Elections*, 2026 WL 1999921, at *8-11. No party argued the issue here.

concluded the Attorney General's following demand "adequately stated the basis and the purpose" for its record request:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.
>
> The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

306 F.2d at 229, 229 n.6 (text only). Thereafter, in *Kennedy v. Bruce*, the Fifth Circuit again upheld the Attorney General's properly stated demand:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.
>
> The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

298 F.2d 860, 861 (5th Cir. 1962) (text only).

These cases also show that the DOJ wrote statutorily compliant demand letters sixty years ago. Now, Defendants contend the DOJ's Demand Letter fails to do the same as it does not meet the requirements of Section 20703. *See* Doc. 32 at 9-13; Doc. 34 at 10-13; Doc. 35 at 22-24. The Court agrees—the DOJ's Demand Letter lacks key components of Section 20703.

Turning first to the "demand," the statutory text requires the Attorney General send a "demand in writing" with "the basis and the purpose" detailed therein. § 20703. Here, based on the CRA's plain language, the measure of the DOJ's written demand is the Demand Letter alone, Doc. 2-3. *See* Doc. 32 at 9-10 (NM Alliance arguing the Court may only consider the Demand Letter). Subsequent forms, court filings, or "a curing elaboration letter" cannot retrospectively supplement the DOJ's September 8, 2025, correspondence. Doc. 102 at 2; *see Galvin*, 2026 WL

972129, at *3 ("The statute therefore directs the Court to the Attorney General's written demand—rather than the United States' subsequent court filings—to determine whether that demand 'contain[ed] a statement of the basis' for the demand."); *Oregon*, 2026 WL 318402, at *9 ("[The DOJ]'s patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis' fails."); *cf. Benson*, 2026 WL 1815425, at *8 ("None of the three letters contains both a statement of the basis along with the purpose of the government's request[.]"). Concluding otherwise would be inapposite to the language of the CRA. "The statute says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 426 (2018).

Next, looking at the final sentence of Section 20703—"[t]his demand *shall* contain a statement of the basis *and* the purpose therefor,"—Congress "impose[d] a mandatory command" with the use of the word "shall." § 20703 (emphasis added); *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("'Shall' means 'must'"). Moreover, "the use of the conjunctive 'and,' in the phrase . . . clearly indicates that the [DOJ] cannot satisfy the statutory mandate by simply" supplying only "the basis" or only "the purpose." *Qwest Commc'ns Int'l Inc. v. FCC*, 398 F.3d 1222, 1236 (10th Cir. 2005). "'And,' in grammatical terms, is of course a conjunction—a word whose function is to connect specified items." *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (noting "and" means "along with or together with"). In this way, if the Attorney General's written demand only includes a statement of "the basis," but not "the purpose," or vice versa, it is statutorily insufficient. *See, e.g.*, *Benson*, 2026 WL at 1815425, *8 ("The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose . . . The statutory text suggests that any demand must contain both."); *Scanlan*, 2026 WL 1864054, at *6 ("To read the statute as satisfied by a statement of either

18

basis or purpose alone would run afoul of the ordinary rules of statutory construction by rendering one half of the phrase superfluous.").

Further, by using the word "the" before "basis" and "purpose," Section 20703 requires the Attorney General outline both the discrete factual and the legal motivations underlying the request. *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the "definite article 'the'" and indefinite article "a"); *Scanlan*, 2026 WL 1864054, at *6 ("On its plain terms, this construction signals that 'basis' and 'purpose' are separate, non-overlapping requirements, each of which must independently be satisfied."). In other words, where "the basis" is founded in the facts of the investigation, "the purpose" is rooted in the DOJ's legal rationale. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Oregon*, 2026 WL 318402, at *9 ("The Court understands 'basis' to mean a factual basis for investigating a violation of a federal statute."); *Galvin*, 2026 WL 972129, at *4 (finding the DOJ's letter insufficient because it "contains nothing that could fairly be characterized as the factual basis for the demand"); *Amore*, 2026 WL 1040637, at *11 ("To read 'basis' as meaning a legal basis would conflate that requirement with the required statement of the demand's 'purpose.'"); *Scanlan*, 2026 WL 1864054, at *7 ("If 'the purpose' denotes the investigative objective of the demand, it follows that 'the basis' in this context is the evidentiary or factual predicate giving rise to the demand in the first place.").

Here, the DOJ's Demand Letter fails because it altogether lacks an identifiable "basis." Nowhere does the DOJ articulate any factual suggestion that New Mexico has violated the NVRA or HAVA, indicate the State has a pattern or practice of noncompliance with the same, nor does it explain how the unredacted PII is necessary to evaluate compliance with the NVRA and HAVA.

At most, the Demand Letter conveys the Attorney General's generalized question about New Mexico's VRL maintenance. Had the DOJ identified as the factual "basis" statistical anomalies within New Mexico's voter registration data or conduct associated with the State's VRL maintenance practices, then the outcome may have been different. Instead, the DOJ's Demand Letter is nearly identical to that in *Galvin* where "the Attorney General offered no basis—none— and the demand was therefore facially inadequate." 2026 WL at 972129, at *4. In the end, the Court, like Toulouse Oliver, is left to speculate as to "the basis" that led the DOJ to send its records request. This does not satisfy Section 20703.

Consequently, the DOJ has failed to state a claim under the CRA. Because the Demand Letter lacks "the basis" for the DOJ's records request, the Court need not determine whether the Government provided the sufficient "purpose." *See Scanlan*, 2026 WL 1864054, at *8 ("The absence of any basis is independently fatal to the United States' claim and provides an independent ground for dismissal of the CRA claim."). Hence, the Court will grant Defendants' Motions to Dismiss, Docs. 32, 34, 35; and deny the DOJ's Motion to Compel, Doc. 2.[19]

**CONCLUSION**

The DOJ offered no "basis" whatsoever in its Demand Letter. Because of this, the DOJ has failed to provide "the basis and the purpose" mandated by Section 20703 of the CRA. Therefore, its Demand Letter is facially inadequate, and the Complaint fails to state a claim under Rule 12(b)(6). Doc. 1; *see Ashcroft*, 556 U.S. at 678. Accordingly, the Court does not reach Defendants'

---

[19] Ordinarily, the Court allows a plaintiff the opportunity to amend its complaint prior to dismissal. Although, for the reasons discussed above, the DOJ cannot remedy the shortcomings in its Demand Letter with an amendment or by sending "a curing amendment letter." Doc. 102 at 2. In this way, amendment would be futile. Accordingly, "dismissal with prejudice is appropriate." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

other arguments for dismissal. Ultimately, for all the reasons explained above, the Court hereby

orders the following:

1. Defendant Maggie Toulouse Oliver's Motion to Dismiss Pursuant to Federal Rule 12(b)(6) and Memorandum of Law in Support, Doc. 35, is **GRANTED**;

2. Intervenor-Defendant New Mexico Alliance for Retired Americans' Motion to Dismiss, Doc. 32, is **GRANTED**;

3. Intervenor-Defendants Common Cause, Claudia Medina, and Justin Allen's Motion to Dismiss, Doc. 34, is **GRANTED**;

4. The Department of Justice, Civil Rights Division's Motion to Compel Production of Records Demanded Pursuant to 52 U.S.C. § 20705, Doc. 2, is **DENIED AS MOOT**; and

5. Pursuant to Federal Rule of Civil Procedure 12(b)(6), this case is hereby **DISMISSED WITH PREJUDICE**.

The Court will separately enter a final judgment pursuant to Rule 58 of the Federal Rules

of Civil Procedure.

SENIOR UNITED STATES DISTRICT JUDGE

21